92 A.3d 766

COMMONWEALTH of Pennsylvania, Appellee

v.

Benjamin WALKER, Appellant.

Supreme Court of Pennsylvania.

Argued March 7, 2012.

Decided May 28, 2014.

452

Karl Baker, Esq., Philadelphia, for Benjamin Walker.

Nyssa E. Taylor, Esq., Defender Association of Philadelphia, for Benjamin Walker.

Nicole Jeanne Aiken, Esq., David Richman, Esq., Pepper Hamilton LLP, Philadelphia, Howard D. Scher, Esq., Philadelphia, Jill Rogers Spiker, Esq., Buchanan Ingersoll & Rooney, P.C., for The Innocence Network and The Pennsylvania Innocence Project.

Jules Epstein, Esq., Kairys, Rudovsky, Messing & Feinberg, Philadelphia, for Pennsylvania Association of Criminal Defense Lawyers.

Eric Johnson Mahr, Esq., Wilmer, Cutler, Pickering, Hale and Dorr, L.L.P., for American Psychological Association.

Hugh J. Burns Jr., Esq., Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice TODD.

In this appeal by allowance we address the question of whether a trial court may, in its discretion, permit expert testimony in the area of eyewitness identification, and, in doing so, we reconsider our current decisional law which absolutely bans such expert testimony. For the reasons that follow, we hold that, in Pennsylvania, the admission of expert testimony regarding eyewitness identification is no longer *per se* impermissible, and join the vast majority of jurisdictions which leave the admissibility of such expert testimony to the discretion of the trial court. Thus, we reverse the order of the Superior Court, and remand the matter to the trial court for reconsideration of such expert testimony, including the possibility of a *Frye* hearing in light of our decision today.[1]

---

1. As discussed more fully *infra,* a *Frye* hearing, named after the seminal decision in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), is a hearing held for the trial court to determine whether the general

The origins of this appeal stem from two armed robberies which occurred within two weeks of each other in October 2005 in Philadelphia. As found by the trial court, at 1:00 a.m. on October 15, 2005, three Drexel University students, Jenna Moreno, Courtney Howe, and Caitlyn Costello, were walking south on 36th Street at the intersection of Baring Street. At this intersection is a church with a lighted archway. A man alleged to be Appellant, Benjamin Walker, approached the women, drew a black handgun approximately 6–8 inches in length, cocked it, and demanded that the women give him their money. After the women explained that they had no money, the assailant demanded their cell phones. Each complied, giving the man their cell phones and digital cameras.

The victims immediately went to campus security who escorted them to a police station to provide a statement and identify their assailant. Two days later, the victims met with Philadelphia Police Detective William Farrell to determine if they could identify the assailant from two photo arrays. Each photo array was composed of eight individuals. Included in the photo arrays were Appellant, along with another suspect, and other individuals closely resembling Appellant and the other suspect. The three victims were separated and provided a photo array one at a time. Moreno and Howe identified Appellant out of the photo arrays. Three months later, on January 18, 2006, Moreno identified Appellant in an in-person lineup.

The second robbery occurred on October 28, 2005. At approximately 3:00 a.m., University of Pennsylvania students Jonathan Ghitis and Kristina Leone were walking west on Pine Street between 40th and 41st Streets. This section of Pine Street is residential in character with several lampposts lining the street. Again, a man alleged to be Appellant and a co-conspirator walked toward the students. As the men approached the couple, Appellant separated from his co-conspirator, and flashed a silver handgun, approximately 6–8 inches in length. Leone began to scream. Appellant threw her to

scientific community has reached a general acceptance of the principles and methodology used by the expert witness.

the ground and ordered her to be quiet. At the same time, Appellant's co-conspirator threw Ghitis down onto steps of a nearby residence. The men demanded whatever the victims had. Immediately, Leone gave Appellant her pocketbook, and Ghitis gave Appellant's co-conspirator his wallet, watch, and cell phone. Leone continued to cry and scream, and, so, Appellant, although already in possession of her pocketbook, repeatedly struck her on the back of her head with his gun. Appellant ordered Ghitis to calm Leone, which he did. Appellant let Leone go, and shortly thereafter, Appellant and his co-conspirator fled the scene.

At 3:30 a.m., after calling the police, both victims gave their account of the events and described their assailant to Detective Philip Lydon of the University of Pennsylvania police department. They met with Detective Lydon at his headquarters three hours later. There, the Detective separated the victims and showed three separate photo arrays of individuals that had similar characteristics to Appellant. Leone looked at the first array and told Detective Lydon that she could not recognize anyone. Upon viewing the second array, Leone immediately identified Appellant, viscerally reacting to his picture. Leone was shown a third array, which included an individual the police suspected was Appellant's co-conspirator, but she could not identify him. Leone spent three to four minutes looking at the arrays. Detective Lydon did not comment to her as to whether Appellant was a suspect after she had made her identification. The same procedure was conducted with Ghitis. He pointed out Appellant from the array, but was less than 100% positive. Again, Detective Lydon did not comment to Ghitis whether Appellant was the suspect after he made his identification. The sole evidence connecting Appellant to the robberies was eyewitness identification by the victims.

Appellant was arrested and charged with various crimes relating to the two robberies, and the charges were consolidated for a single trial. Appellant filed a pre-trial motion *in limine* to present the expert testimony of Dr. Solomon Fulero regarding the fallibility of human memory, the science as to

human recall, and scientific studies related to the reliability of eyewitness testimony generally. In the alternative, Appellant requested a *Frye* hearing to determine the admissibility of such evidence. After hearing argument, the court denied the motions on September 17, 2007. After trial, the jury acquitted Appellant on all charges relating to the October 15, 2005 robbery involving the three Drexel students, but found Appellant guilty of five charges relating to the October 28, 2005 robbery involving the two University of Pennsylvania students.[2] On December 12, 2007, the trial court sentenced Appellant to an aggregate term of incarceration of 17½–35 years, followed by 5 years probation.

Regarding the denial of Appellant's motion to admit expert testimony on human recall, or to hold a *Frye* hearing, the trial court's threshold determination was that a *Frye* hearing was not necessary, relying upon Pennsylvania case law which holds that expert testimony concerning eyewitness identification is inadmissible. *Commonwealth v. Simmons*, 541 Pa. 211, 662 A.2d 621 (1995); *Commonwealth v. Bormack*, 827 A.2d 503 (Pa.Super.2003). The trial court opined that, not only has our Court explained that an expert would have an unwarranted appearance of authority on the eyewitness's credibility, but that a defendant was free to attack a witnesses' credibility by pointing out inconsistencies through cross-examination and in closing arguments.

The trial court also rejected Appellant's claim that he was denied his constitutional right to present a defense under the United States and Pennsylvania Constitutions by excluding expert testimony, both on eyewitness identification and on suggestiveness of out-of-court identification procedures. The trial court reasoned that, as defendants must comply with the rules of evidence to assure fairness and reliability in the ascertainment of guilt and innocence, and as expert testimony on eyewitness identification is inadmissible, this argument was

2. Aggravated assault 18 Pa.C.S.A. § 2702(a)(1); firearms not to be carried without a license, 18 Pa.C.S.A. § 6106(a)(1); prohibited person in possession of a firearm, 18 Pa.C.S.A. § 6105(a)(1); criminal conspiracy, 18 Pa.C.S.A. § 903(a)(1); and two counts of robbery, 18 Pa.C.S.A. § 3701(a)(1)(i).

without merit. The court, thus concluded that it did not infringe upon Appellant's constitutional right to present a defense. Furthermore, the trial court dismissed Appellant's contention that his expert testimony was admissible pursuant to Rule 702 of the Pennsylvania Rules of Evidence. Noting that this Court in *Simmons* has already spoken to the admissibility of expert testimony, that Rules 401 and 403 require that all evidence be relevant, and that the probative value outweigh its danger of unfair prejudice, the trial court found that Appellant's statistics regarding eyewitness identifications had no bearing on whether the eyewitnesses testifying in this case were mistaken. Thus, the expert testimony, according to the trial court, did not make the fact of the eyewitnesses' identification more or less probable. Finally, according to the trial court, even assuming that the expert's testimony met the threshold for relevance, the probative value of such testimony was nominal, as several witnesses identified Appellant and their encounters with him were more than brief. Again, consistent with *Simmons,* the trial court reasoned that an expert would have an unwarranted appearance of authority on the eyewitness's credibility.[3]

On appeal, a unanimous three judge panel of the Superior Court affirmed Appellant's judgment of sentence in an unpublished memorandum opinion. With respect to the issue of the trial court's denial of the admission of expert testimony on the subject of eyewitness identification, the Superior Court initially noted that evidentiary rulings and the admission of expert testimony is a matter of discretion for the trial court, and will not be disturbed absent an abuse of discretion. The Superior Court explained that it was mindful that our Court has been "unequivocal" in rejecting expert testimony regarding the reliability of eyewitness identification, as such testimony would impermissibly speak to the credibility of a witness's testimony,

---

**3.** Similarly, the trial court addressed and rejected Appellant's related claim that it erred in failing to take judicial notice of certain "facts" relating to eyewitness identifications which may have caused the identifications to be unreliable, repeating that such information was not relevant to the case, and that cross-examination and closing arguments were the appropriate vehicle by which to educate the jurors of these factors.

which is for the jury to assess, citing *Simmons,* and that the Superior Court has consistently followed this precedent, citing *Bormack. Commonwealth v. Walker,* 1477 EDA 2008 at 14–15, 11 A.3d 1034 (Pa.Super. filed August 23, 2010). Thus, based upon our Court's prior case law, the Superior Court found itself "constrained to apply the consistent precedent of our Supreme Court until it rules otherwise with regard to this type of evidence." *Id.* at 16.[4]

We granted allocatur to consider whether a trial court may permit, in its discretion, the testimony of an expert in the field of eyewitness identification. Implicit in resolving this question is the issue of whether the allowance of such expert testimony improperly encroaches on the credibility determining function of the finder of fact. Specifically, we granted allowance of appeal on the following two issues, as stated by Appellant:

a. Should not the trial court have had the discretion to permit [Appellant] to present the testimony of a nationally recognized expert in the field of human memory, perception and recall where the sole evidence to establish guilt was the testimony of a victim who was under extreme duress when assaulted at gunpoint by a stranger of another race?

b. Should not the court permit expert testimony, whether it be for the defense or prosecution, on how the mind works as long as such testimony has received general acceptance within the scientific community?

*Commonwealth v. Walker,* 610 Pa. 8, 17 A.3d 921 (2011) (order).

Traditionally, in reviewing trial court decision making regarding the admissibility of evidence, an appellate court

4. The Superior Court also rejected Appellant's related argument that the court should take judicial notice of certain scientifically proven facts relating to eyewitness identification, including weapons focus; cross-racial identification; high-stress/traumatic criminal events; and witness statement confidence and witness accuracy. *Id.* at 20. Again, the Superior Court explained that, like its rationale regarding expert testimony on witness identification, taking judicial notice of scientific facts concerning the reliability of eyewitness identification would invade the province of the jury to assess credibility.

determines whether the lower tribunal abused its discretion. *Paden v. Baker Concrete Constr. Inc.*, 540 Pa. 409, 658 A.2d 341 (1995). An abuse of discretion "is not merely an error of judgment, but if in reaching a conclusion the law is over ridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." *Mielcuszny et ux. v. Rosol*, 317 Pa. 91, 93–94, 176 A. 236, 237 (1934). The circumstances in this appeal, however, are somewhat unique. The lower tribunals adhered to our prior precedent regarding the admission of expert testimony concerning eyewitness identification in rendering their decisions, and, thus, we are asked to reevaluate our prior decisions, which raises a pure question of law. Thus, in these circumstances, our standard of review is *de novo* and our scope of review plenary. *Buffalo Twp. v. Jones*, 571 Pa. 637, 645 n. 4, 813 A.2d 659, 664 n. 4 (2002).

Initially, Appellant notes the quantifiable and peculiar problems inherent in questions of identification and asserts that mistaken identifications are the leading cause of wrongful convictions. Appellant submits that because DNA evidence is often times unavailable, determinations of guilt must be based on an accurate understanding of perception, memory, and recall. According to Appellant, scientific advancements in the field of memory and eyewitness identification evince "the need for expert testimony to explain the vagaries inherent in eyewitness identification." Appellant's Brief at 12.

Appellant offers that Dr. Fulero would have explained to the jury how the mind works and informed the jury of certain "scientifically proven facts" relating to eyewitness identification. *Id.* These findings, as stated by Appellant, are: "(1) the phenomenon of 'weapons focus'; (2) the reduced reliability of identification in cross-racial identification cases; (3) the significantly decreased accuracy in eyewitness identifications in highstress/traumatic criminal events; (4) increased risk of mistaken identification when police investigators do not warn a witness, prior to viewing a photo array or line up, that the perpetrator may or may not be in the display; and (5) the lack

of a strong correlation between witness statements of confidence and witness accuracy." *Id.* According to Appellant, "[a]ll of these scientific findings have received general acceptance in the scientific, legislative, and judicial communities." *Id.*

Specifically, regarding the "weapons focus" effect, Appellant claims that multiple studies have shown that the presence of a weapon during an event impairs eyewitness memory and identification accuracy. Appellant points to numerous court decisions in which "weapons focus" has been accepted as a valid scientific principle, including, *People v. Cornwell*, 37 Cal.4th 50, 33 Cal.Rptr.3d 1, 117 P.3d 622 (2005); *Campbell v. State*, 814 P.2d 1 (Colo.1991); *Garden v. State*, 815 A.2d 327 (Del.2003); *United States v. Brownlee*, 454 F.3d 131 (3d Cir.2006); and *United States v. Mathis*, 264 F.3d 321 (3d Cir.2001).

Similarly, Appellant asserts that studies have consistently shown that cross-racial identification is not as accurate as same-race recognition. Citing to the American Bar Association Criminal Justice Section Report to the House of Delegates, Appellant offers that it found that "the issue of mistaken eyewitness identification and the increased risk of cross-racial eyewitness identification is a serious problem in the United States." ABA Criminal Justice Section Report to House of Delegates 104D (2008) (available at http://www.americanbar.org/content/dam/aba/publishing/criminal_justice_section_newsletter/crimjust_policy_am08104d.authcheckdam.pdg). He further adds that "[c]ourts should have the discretion, where appropriate in an individual case, to allow a properly qualified expert to testify both pretrial and at trial on the factors affecting eyewitness accuracy." ABA Statement of Best Practices for Promoting the Accuracy of Eyewitness Identification Procedures, ABA Criminal Justice Section, 1 n. 16 (August 2004) (available at http://www.americanbar.org/content/dam/aba/migrated/leadership/2004/annual/111c.authcheckdam.doc). Additionally, Appellant points to case law noting that especially where cross-racial identification is involved, human perception is inexact and memory fallible.

*Commonwealth v. Christie,* 98 S.W.3d 485 (Ky.2002); *State v. Cromedy,* 158 N.J. 112, 727 A.2d 457 (1999); *People v. Radcliffe,* 196 Misc.2d 381, 764 N.Y.S.2d 773 (N.Y.S.2003); *State v. Whaley,* 305 S.C. 138, 406 S.E.2d 369 (1991); *State v. Copeland,* 226 S.W.3d 287 (Tenn.2007).

With respect to the impact of stress on eyewitness identifications, Appellant references studies which show a significant difference in correct identifications in a low-stress setting compared to those made in a high-stress setting and case law supporting expert testimony regarding this subject. *Skamarocius v. State,* 731 P.2d 63 (Alaska App.1987); *Garden; State v. Allen,* 376 Ill.App.3d 511, 314 Ill.Dec. 934, 875 N.E.2d 1221 (2007); *Currie v. Com.,* 30 Va.App. 58, 515 S.E.2d 335 (1999); *Brownlee; United States v. Harris,* 995 F.2d 532 (4th Cir. 1993). Appellant also cites various studies in contending that failure of a police officer to inform a witness that the perpetrator may or may not be in a photo array contributes to a risk of misidentification. This concern, according to Appellant, has been voiced in case law as well. *State v. Ledbetter,* 275 Conn. 534, 881 A.2d 290 (2005); *Stephenson v. State,* 226 S.W.3d 622 (Tex.App.2007). Finally, based upon various studies, Appellant advances that any correlation between witness confidence in identification, and witness accuracy in identification, is minimal. Appellant offers two examples where eyewitness testimony, including in one instance five eyewitness testimonials, which were expressed with confidence, nevertheless led to convictions which DNA evidence later refuted. According to Appellant, expert testimony on the absence of confidence-accuracy correlation has been accepted in numerous jurisdictions, citing, *inter alia, Radcliffe, supra.*

Appellant goes on to offer that Dr. Fulero's testimony regarding eyewitness testimony would have assisted the jurors in this case. Appellant submits that lay persons' knowledge of eyewitness behavior is not only limited in scope but also highly inaccurate. Appellant adds that cross-examination is not an effective tool to educate jurors regarding the potential inaccuracy of witness identification. This is especially true, according to Appellant, when witnesses, although mistaken, sincerely

464

believe what they say is true. *State v. Clopten*, 223 P.3d 1103, 1110 (Utah 2009). Appellant maintains that making jurors aware of the variables that impact eyewitness accuracy is critical to "a fair adjudication of the truth." Appellant's Brief at 24. Building upon his argument, Appellant contends that the only evidence offered by the Commonwealth in this case were the victim's cross-racial identifications after a stressful nighttime gunpoint robbery, and included identifications from photo arrays, which, according to Appellant, were designed around Appellant and his brother. As noted by Appellant, these eyewitness identifications were without corroboration. Related thereto, Appellant, in a largely undeveloped argument, claims that he has a constitutional right to present a defense, including expert testimony on eyewitness identification, under the Sixth Amendment to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution.

Turning to admissibility under Pa.R.E. 702, Appellant maintains that every requirement of Rule 702 has been met. Specifically, Appellant argues that, under the *Frye* general acceptance test, testimony by eyewitness identification experts has been generally accepted, and that there is a high degree of consensus among researchers. This acceptance has been confirmed by numerous federal and state judicial decisions applying both the *Frye* and *Daubert* tests[5] to such evidence. Additionally, Appellant urges that expert testimony on eyewitness identification should no longer be considered as speaking to credibility, and is distinct from testimony that a particular witness is reliable or not. Appellant stresses that such an expert provides the jury with more information so that it can make informed decisions.

**5.** The United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), held that *Frye* was superseded in the federal courts by F.R.E. 702. Various states have adopted the *Daubert* test for the admission of expert testimony. In *Grady v. Frito–Lay, Inc.*, 576 Pa. 546, 839 A.2d 1038 (2003), our Court reaffirmed that *Frye* would continue to control the admissibility of scientific evidence in the Commonwealth.

Related thereto, Appellant highlights that, of the jurisdictions that have considered this issue, the vast majority give the trial court discretion to allow an expert to testify regarding eyewitness identification, and only a minority of three jurisdictions besides Pennsylvania—Louisiana, Kansas, and Nebraska—embrace such a *per se* exclusion. Touting the "modern trend," Appellant urges that in cases where stranger-eyewitness identification is a key element of the prosecution's case, expert testimony on such identification should be permitted. Appellant's Brief at 36. Appellant highlights that, in the past 15 years, numerous states, including Iowa, Kentucky, Tennessee, and Utah, which had previously utilized the absolute prohibition approach, have reversed themselves and embraced this trend, and calls for Pennsylvania to do the same.

Amicus American Psychological Association ("APA") supports the admission of expert testimony regarding the factors that bear on eyewitness testimony. Citing various studies, the APA first offers that most jurors do not know, or misunderstand, the issue of eyewitness testimony accuracy, and that expert testimony can bridge this "knowledge gap." APA Brief at 6. Echoing Appellant's arguments, the APA submits that expert testimony does not invade the province of the jury, as such testimony does not go to whether a particular witness is lying, and, moreover, does not give an opinion on the accuracy of a particular witness' identification. Rather, the expert would speak to objective scientific research and knowledge relating to eyewitness identification. The APA offers that studies suggest that jurors do not abdicate their fact-finding role when presented with expert testimony. Turning to the requirement that the methodology underlying the expert testimony must have general acceptance in the relevant scientific community, the APA submits that extensive research has been conducted on human memory and its limits, as well as inaccurate eyewitness identification, and, thus, the science of eyewitness identification passes the *Frye* general acceptance test. Finally, the APA notes that researchers have identified numerous factors that impact eyewitness identification, including those areas at issue in this appeal.

Amici Innocence Network and the Pennsylvania Innocence Project ("Amici"), while covering many of the same arguments as Appellant, first emphasize the high percentage of erroneous eyewitness identifications involved in convictions later vacated and urge that evolving scientific knowledge requires a change in approach to the admission of expert testimony which is necessary to ensure that fact finders have complete and accurate information about eyewitness identification. Amici offers that a vast majority of states and the federal circuits permit eyewitness identification expert testimony and leave it to the discretion of the trial judge as to whether to admit such evidence. According to Amici, such testimony should be permissible at every stage of criminal proceedings where eyewitness testimony is offered. Amici point out that the United States Supreme Court in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), set forth the minimum due process requirements for the admission of pretrial identification evidence. *Manson* relies on five factors: (1) the opportunity of witnesses to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. *Id.* 432 U.S. at 113, 97 S.Ct. 2243. Amici contends that this criteria is no longer satisfactory in light of the scientific research conducted since *Manson*, and that it fails to permit additional factors bearing on eyewitness identification. Further, Amici offers that the admission of expert testimony in this area should be determined on a case-by-case basis, under the same standards applicable to other expert testimony. Finally, and while largely tracking Appellant's arguments, the Pennsylvania Association of Criminal Defense Lawyers, as do prior amici, adds that, in its view, expert testimony regarding eyewitness identification would satisfy Rule 702, including being scientifically reliable, and would not constitute an impermissible comment on credibility.

The Commonwealth emphasizes that our Court has repeatedly held that expert testimony on the reliability of eye-

witness identifications is inadmissible. The Commonwealth contends that, under Pennsylvania Rule of Evidence 403, psychological testimony concerning eyewitness testimony is unfairly prejudicial because it invites the jury to abdicate its responsibility. The Commonwealth offers that "credibility" is more than simply whether a witness is lying, but is the quality that makes a witness worthy of belief, including trustworthiness and reliability. Thus, the Commonwealth submits that Appellant's theory of mistaken identity based upon a witness's inability to identify a perpetrator directly challenges the witness's credibility, even though it does not suggest the witness is intentionally lying. Commonwealth's Brief at 9. Thus, according to the Commonwealth, when properly understood, expert testimony on the reliability of eyewitness testimony constitutes prohibited expert testimony on the credibility of eyewitnesses. Moreover, the Commonwealth asserts that expert testimony that does not address a *particular* witness's ability to make an accurate identification improperly shifts the jury's focus to the credibility of identifications from a class of witnesses and to the expert assessment of the credibility of eyewitnesses generally. This, the Commonwealth contends, gives the expert an unwarranted appearance of authority on the subject of witness credibility, citing *Commonwealth v. Crawford*, 553 Pa. 195, 718 A.2d 768 (1998); *Commonwealth v. D.J.A.*, 800 A.2d 965 (Pa.Super.2002). The Commonwealth claims that Appellant's proffered expert testimony is identical to that which our Court has previously rejected, citing *Simmons, supra*, and *Commonwealth v. Spence*, 534 Pa. 233, 627 A.2d 1176 (1993). Thus, according to the Commonwealth, the trial court properly excluded Appellant's expert testimony.

The Commonwealth argues that, even if our Court were to review the admissibility question anew, prejudice and other damaging effects of expert testimony on eyewitness reliability would outweigh any probative value. The Commonwealth offers its own study which it claims confirms that expert testimony does not make juries better able to distinguish between reliable and unreliable identifications, and instead makes juries skeptical of all identification evidence. *See* Mar-

tire and Kemp, Can Experts Help Jurors to Evaluate Eyewitness Evidence? A Review of Eyewitness Expert Effects, Legal and Criminological Psychology 16 (2011) ("Martire and Kemp"). Rather than making jurors more sensitive to identifications of varying quality, the Commonwealth postulates that expert testimony makes jurors skeptical of eyewitness identification, undermining the credibility of both relatively strong and relatively weak eyewitness testimony. Thus, the Commonwealth avers that psychological studies on the issue show that expert testimony on eyewitness reliability is more than twice as likely to cause unfair prejudice to the prosecution as it is to fairly help the jury and that such testimony is more likely to have no effect or cause unfair prejudice to the defendant than to help the jury. Thus, according to the Commonwealth, the probative value of expert testimony in these instances is outweighed by the danger of prejudice and juror confusion.

Additionally, the Commonwealth asserts that expert testimony is not superior to cross-examination which is the primary means of exposing testimony that is inaccurate and mistaken. *Manson; U.S. v. Salerno*, 505 U.S. 317, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992) (Stevens, J. dissenting) ("[I]n the Anglo–American system cross-examination is the principal means of undermining the credibility of a witness whose testimony is false *or inaccurate*." (emphasis added and footnote omitted)). According to the Commonwealth, again citing to studies regarding juror sensitivity, cross-examination is superior to the use of expert testimony as a tool for exposing eyewitness unreliability.

The Commonwealth warns that permitting expert testimony on eyewitness reliability would present numerous practical problems, including exposing the judiciary to hundreds or thousands of potential ineffectiveness assistance of counsel claims in violent felony cases. While acknowledging that these concerns are not dispositive, the Commonwealth contends they weigh against a change to current precedent. Moreover, the Commonwealth argues it would inevitably lead to expensive, time-consuming, and potentially prejudicial bat-

tles of experts on other issues that the Commonwealth submits are properly left to the jury. The Commonwealth suggests defendants may intentionally omit expert testimony through gamesmanship to allow for an appellate or postconviction claim, and raises the specter of reversal of state convictions on federal *habeas corpus* review. The Commonwealth presses its argument, offering that there would be no firm distinction between expert testimony on eyewitness testimony and expert testimony on "how the mind works" in other situations, suggesting a slippery slope of overruling prior decisions prohibiting expert testimony in various other matters. *See Crawford* (repressed memories); *Commonwealth v. Gallagher*, 519 Pa. 291, 547 A.2d 355 (1988) ("rape trauma syndrome"); *Commonwealth v. Davis*, 518 Pa. 77, 541 A.2d 315 (1988) (ability to fabricate sexual experiences); *Commonwealth v. Seese*, 512 Pa. 439, 517 A.2d 920 (1986) (veracity of children who claim to be victims of sexual abuse). The Commonwealth argues that if such expert testimony was allowed for the defense, at a minimum, the prosecution would be permitted to call its own expert to challenge the claims of the defense expert and to present testimony on factors—such as the witness's youth and close proximity to his or her attackers, and same-race identification—that according to studies *enhance* the reliability of identifications. The Commonwealth even posits the possibility of expert testimony on the effect that expert testimony has on jurors and expert testimony on "informational cascades," actions by which laypersons and experts accept uncritically even erroneous views of experts who have considered an issue before them.[6]

With respect to the studies offered by Appellants in support of their desire to permit the admission of expert testimony regarding eyewitness identification, the Commonwealth contends that, even if relevant, these publications and extra-

6. Indeed, the Commonwealth boldly goes so far to extrapolate this theory beyond the scientific arena, and suggests that "informational cascades" may account for why so many jurisdictions allow eyewitness identification expert testimony. Commonwealth Brief at 27 n. 8. We are confident that the judges of our sister states and the federal judiciary who have addressed this very difficult issue have done so after careful consideration, rather than simply following the herd.

jurisdictional cases are largely the same as those presented to our Court in previous cases. The Commonwealth adds that the "wrongful conviction" lists cited by Appellant and amici are exaggerated and unreliable, and do not demonstrate the degree to which eyewitness errors occur, do not offer any particular cause for the mistakes, and do not establish that expert testimony would improve the accuracy of verdicts.

According to the Commonwealth, the publications cited by Appellants do not address what it believes to be the core issue of unfair prejudice and juror confusion. Indeed, the Commonwealth claims that there is no *Frye* issue in this case. According to the Commonwealth, even if every publication were based on "actual science" and were generally accepted in the relevant scientific community, expert evidence should be excluded under Rule 403 as it will not assist the trier of fact, as it is inherently more prejudicial than probative. While denying their relevance, the Commonwealth argues that the studies on which Appellant relies do not involve or replicate actual crimes with actual victims and eyewitnesses. Watching a video or live-action simulation cannot replicate real life, and, the emotion of being a victim of a violent crime, and, thus, according to the Commonwealth, such studies are unreliable compared to studies of actual cases. Finally, the Commonwealth asserts that admitting expert testimony regarding eyewitness testimony fails to account for the nature of our jury system, and that, rather than the admission of expert testimony, the best way to account for eyewitness credibility is reliance upon the "collective sense and experience" of twelve people who will "bring to their deliberations an array of experiences and views on the issues affecting eyewitness credibility." Commonwealth Brief at 43. Here, the Commonwealth emphasizes that multiple witnesses identified Appellant both before and at trial, Appellant was able to extensively cross-examine each witness, and after consideration of the circumstances affecting the reliability of the identifications, the jury acquitted Appellant of three of the robberies.

The Commonwealth also counters Appellant's accounting of the various jurisdictions that give trial courts the discretion to

admit expert testimony on eyewitness identification by first suggesting that our Court's exclusion of such expert testimony is hardly an anomaly. The Commonwealth continues that a number of the jurisdictions favoring discretion on the part of the trial court in admitting expert testimony are without any coherent reason for doing so, citing *Simmons v. State*, 934 So.2d 1100 (Fla.2006), and advocates "clear rules and uniform justice," instead of "inconsistent results." Commonwealth Brief at 46. Finally, the Commonwealth rebukes Appellant's due process claim, noting a defendant's right to present evidence is not unlimited, but subject to relevancy and applicable evidentiary rules, and that, here, under Pennsylvania's long-standing precedent, Appellant's proposed expert testimony is inadmissible.

█ Our analysis begins with a brief background regarding eyewitness identification and the current state of Pennsylvania law concerning the admissibility of expert testimony regarding eyewitness identification.

█ Eyewitness evidence may be extremely probative of guilt and is often times crucial to the Commonwealth's case against a defendant, and, thus, indispensable to the proper functioning of our criminal justice system. It is arguably the most powerful form of evidence. As Justice William Brennan noted, "There is almost *nothing more convincing* than a live human being who takes the stand, points a finger at the defendant, and says 'That's the one!'" *Watkins v. Sowders*, 449 U.S. 341, 352, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981) (Brennan, J. dissenting) (emphasis original) (quoting Elizabeth F. Loftus, Eyewitness Testimony (1979)). Yet, the high Court has also recognized "the vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." *United States v. Wade*, 388 U.S. 218, 228, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Because eyewitnesses can offer inaccurate, but honestly held, recollections in their attempt to identify the perpetrator of a crime, eyewitness identifications are widely considered to be one of the least reliable forms of evidence. *Id.* ("[United

States Supreme Court] Justice [Felix] Frankfurter once said: 'What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. These instances are recent—not due to the brutalities of ancient criminal procedure.' "). Our Court has long echoed the same sentiment. *See Estate of Bryant,* 176 Pa. 309, 318, 35 A. 571, 577 (1896) ("[R]ecognition or identification [is] one of the least reliable of facts testified to even by actual witnesses who have seen the parties in question."). Thus, as recently emphasized by the United States Supreme Court, "[w]e do not doubt either the importance or the fallibility of eyewitness identifications." *Perry v. New Hampshire,* —— U.S. ——, 132 S.Ct. 716, 728, 181 L.Ed.2d 694 (2012).

The recent advent of DNA testing has raised the profile of erroneous eyewitness identifications, and the resulting overturning of convictions based upon such testing has made the concern over the accuracy of eyewitness identification manifest.[7] Further, DNA testing has brought to the fore the damaging impact of erroneous eyewitness identification as well. While an erroneous eyewitness identification which leads to the wrongful conviction of an innocent defendant no doubt generates great suffering on the part of the individual and his or her family, and possibly death in the capital arena, it is not an issue that impacts only the wrongfully accused; incorrectly identifying their attackers can be traumatizing for a victim, as well, due to the guilt of convicting an innocent person, and the resulting awareness that the criminal who perpetrated the crime remains at large. It is axiomatic that law enforcement officers would express similar views if a wrongful conviction due to erroneous eyewitness testimony permitted dangerous criminals to remain on the loose.

7. *See* Garrett, Judging Innocence, 108 Colum. L.Rev. 55, 60 (2008) (offering that of the first 200 individuals whose convictions were overturned by post-conviction DNA testing, nearly 80% were convicted based upon eyewitness testimony).

■ Thus, as demonstrated above, there is no doubt that wrongful conviction due to erroneous eyewitness identification continues to be a pressing concern for the legal system and society. One way in which fact finders may be assisted in making more accurate and just determinations regarding guilt or innocence at trial is through the admission of expert testimony.

■ Rule 702 of the Pennsylvania Rules of Evidence speaks to the general admissibility of expert testimony where scientific evidence is at issue, and provides that a witness who is qualified as an expert may testify "in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by a layperson; (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and (c) the expert's methodology is generally accepted in the relevant field." Thus, to be admissible, the expert testimony must be beyond the knowledge possessed by a layperson and assist the trier of fact to understand the evidence or determine a fact in issue. Moreover, the Comment to Rule 702 makes clear that this rule reflects our Commonwealth's adoption of the *Frye* standard which allies the "general acceptance" test for admissibility. Pa.R.E. 702 cmt. Thus, the *Frye* standard, as discussed below, is a component of Rule 702. *Commonwealth v. Chmiel,* 612 Pa. 333, 382, 30 A.3d 1111, 1140 (2011).

While in Pennsylvania the admission of expert testimony is generally a matter left to the discretion of the trial court, our decisional law from the mid–1990s has repeatedly barred, without exception, the admission of expert testimony regarding eyewitness identification. *Spence; Simmons; Abdul–Salaam,* 544 Pa. 514, 678 A.2d 342 (1996).

In *Spence,* the first case speaking to this issue, the defendant, on trial for, *inter alia,* first-degree murder, sought to present the expert testimony of a psychologist as to the effects of stress on persons offering identification testimony. Citing prior case law prohibiting expert testimony on various sub-

jects, our Court rejected his claim as giving an unwarranted appearance of authority on the subject of credibility upon which expert opinion may not intrude:

Expert opinion may not be allowed to intrude upon the jury's basic function of deciding credibility. *See, e.g., Commonwealth v. Gallagher,* 519 Pa. 291, 547 A.2d 355 (1988) (error to allow expert testimony in area of "rape trauma syndrome" to explain that such trauma could prevent a victim from making a timely identification of assailant); *Commonwealth v. Davis,* 518 Pa. 77, 541 A.2d 315 (1988) (error to allow expert to testimony that child sex abuse victims generally lack the ability to fabricate sexual experiences); *Commonwealth v. Seese,* 512 Pa. 439, 517 A.2d 920 (1986) (doctor may not testify regarding the veracity of children who claim to be victims of sexual abuse.).

Spence argues that because the expert was going to attack rather than enhance the credibility of the victim, Ogrod, his testimony was permissible. Whether the expert's opinion is offered to attack or enhance, it assumes the same impact— an "unwarranted appearance of authority in the subject of credibility which is within the facility of the ordinary juror to assess." *Commonwealth v. Gallagher,* 519 Pa. at 297, 547 A.2d at 358. The trial court properly excluded the proposed expert testimony.

*Spence,* 534 Pa. at 245, 627 A.2d at 1182.

Two years later, in *Simmons,* a request by the defendant to present testimony on the general topic of the reliability of eyewitness identification was similarly rejected. The *Simmons* Court followed *Spence,* offering similar concerns that such testimony would give "an unwarranted appearance of authority as to the subject of credibility, a subject which an ordinary jury can assess." *Simmons,* 541 Pa. at 231, 662 A.2d at 631. Second, we opined that cross-examination and closing argument was sufficient to challenge the reliability of eyewitness testimony. *Id.* ("[A]ppellant was free to and did attack the witnesses' credibility and point out inconsistencies of all the eyewitnesses at trial through cross-examination and in his closing argument."). Finally, a year after our decision in

*Simmons,* we rejected a similar request for an expert on eyewitness identification, relying on *Simmons* without further analysis. *Abdul–Salaam,* 544 Pa. at 535–36, 678 A.2d at 352. Thus, our cases from the mid–1990s make clear that an unwarranted appearance of authority invading the province of the jury's credibility determination, and the existence of alternative means of challenging the reliability of eyewitness testimony, serve as the basis for the current *per se* ban on expert testimony in this area.

Importantly, while the nature of the advocacy presented to our Court is unclear, in this line of cases, we did not consider or mention the advent of scientific research on the issue of reliability of eyewitness testimony or the experience of other jurisdictions on this topic. Thus, before directly considering the foundations of our current case law, it is important to recognize the considerable empirical research that has been conducted regarding eyewitness identification, as well as the decisional law that has spoken to the admission of expert testimony regarding eyewitness identification.

Since our decision in *Spence,* 20 years of advances in scientific study have strongly suggested that eyewitnesses are apt to erroneously identify a person as the perpetrator of a crime when certain factors are present:

[A] vast body of scientific research about human memory has emerged. That body of work casts doubt on some commonly held views relating to memory ... Study after study revealed a troubling lack of reliability in eyewitness identifications. From social science research to the review of actual police lineups, from laboratory experiments to DNA exonerations, the record proves that the possibility of mistaken identification is real. Indeed, it is now widely known that eyewitness misidentification is the leading cause of wrongful conviction across the country.

*New Jersey v. Henderson,* 208 N.J. 208, 27 A.3d 872, 877–78 (2011). *See also,* Wells and Smalarz, Eyewitness–Identification Evidence: Scientific Advances and the New Burden on Trial Judges, 48 Court Review 14 (2012) (noting vast amount of scientific literature regarding eyewitness identification re-

search and summarizing general principles regarding mistaken identification). Many scholarly articles detail the considerable amount of behavioral research in the area of eyewitness identification. The "extensive and comprehensive scientific research, as reflected in hundreds of peer reviewed studies and meta-analyses,[8] convincingly demonstrates the fallibility of eyewitness identification testimony and pinpoints an array of variables that are most likely to lead to a mistaken identification." *Connecticut v. Guilbert,* 306 Conn. 218, 49 A.3d 705, 720 (2012); *see also,* Mark S. Brodin, Behavioral Science Evidence in the Age of Daubert: Reflections of a Skeptic, 73 U. Cin. L.Rev. 867, 889–90 (2005) ("Ironically, the form of social science evidence which is most solidly based in 'hard' empirical science has met with the most resistance in the courts. Expert testimony concerning the limitations and weaknesses of eyewitness identification is firmly rooted in experimental foundation, derived from decades of psychological research on human perception and memory as well as an impressive peer review literature."). Thus, it is beyond serious contention that the statistical evidence on eyewitness inaccuracy is substantial, and scientific research in the field of eyewitness identification has advanced significantly since our law establishing an absolute ban on expert testimony in this regard 20 years ago.

As a direct result of this growing field of study, the use of experts has gained substantial acceptance by courts nationally. Indeed, there is a clear trend among state and federal courts permitting the admission of eyewitness expert testimony, at the discretion of the trial court, for the purpose of aiding the trier of fact in understanding the characteristics of eyewitness identification. Beginning with the Supreme Court of Arizona's decision in *State v. Chapple,* 135 Ariz. 281, 660 P.2d 1208 (1983), courts in 44 states and the District of Columbia have permitted such testimony at the discretion of the trial judge. *See Ex parte Williams,* 594 So.2d 1225 (Ala.1992); *Skamarocius v. State,* 731 P.2d 63 (Alaska Ct.App.1987); *State*

---

8.   A meta-analysis is a study that combines and synthesizes the results of other available studies.

*v. Nordstrom,* 200 Ariz. 229, 25 P.3d 717 (2001) (en banc), *abrogated on other grounds by State v. Ferrero,* 229 Ariz. 239, 274 P.3d 509 (2012) (en banc); *Parker v. State,* 333 Ark. 137, 968 S.W.2d 592 (1998); *People v. McDonald,* 37 Cal.3d 351, 208 Cal.Rptr. 236, 690 P.2d 709 (1984), *overruled on other grounds, People v. Mendoza,* 23 Cal.4th 896, 98 Cal.Rptr.2d 431, 4 P.3d 265 (2000); *Campbell v. People,* 814 P.2d 1 (Colo.1991) (en banc), *abrogated by People v. Shreck,* 22 P.3d 68 (Colo.2001) (en banc) (to the extent that *Campbell* held out *Frye* as the appropriate standard for determining the admissibility of scientific evidence rather than C.R.E. 702); *State v. Guilbert,* 306 Conn. 218, 49 A.3d 705 (2012); *Garden v. State,* 815 A.2d 327 (Del.2003), *superseded by statute on other grounds,* Del.Code Ann. tit. 11, § 4209(d) (2003); *Benn v. United States,* 978 A.2d 1257 (D.C.2009); *McMullen v. State,* 714 So.2d 368 (Fla.1998); *Howard v. State,* 286 Ga. 222, 686 S.E.2d 764 (2009); *State v. Wright,* 147 Idaho 150, 206 P.3d 856 (Ct.App.2009); *People v. Allen,* 376 Ill.App.3d 511, 314 Ill.Dec. 934, 875 N.E.2d 1221 (2007); *Cook v. State,* 734 N.E.2d 563 (Ind.2000); *State v. Schutz,* 579 N.W.2d 317 (Iowa 1998); *Commonwealth v. Christie,* 98 S.W.3d 485 (Ky.2002); *State v. Kelly,* 752 A.2d 188 (Me.2000); *Bomas v. State,* 412 Md. 392, 987 A.2d 98 (2010); *Commonwealth v. Santoli,* 424 Mass. 837, 680 N.E.2d 1116 (1997); *People v. Carson,* 217 Mich.App. 801, 553 N.W.2d 1 (1996), *adopted in pertinent part, People v. Carson,* 220 Mich.App. 662, 560 N.W.2d 657 (1996); *State v. Miles,* 585 N.W.2d 368 (Minn.1998); *State v. Ware,* 326 S.W.3d 512 (Mo.Ct.App.2010); *State v. DuBray,* 317 Mont. 377, 77 P.3d 247 (2003); *State v. Trevino,* 230 Neb. 494, 432 N.W.2d 503 (1988); *White v. State,* 112 Nev. 1261, 926 P.2d 291 (1996); *State v. Henderson,* 208 N.J. 208, 27 A.3d 872 (2011); *People v. LeGrand,* 8 N.Y.3d 449, 835 N.Y.S.2d 523, 867 N.E.2d 374 (2007); *State v.` Lee,* 154 N.C.App. 410, 572 S.E.2d 170 (2002); *State v. Fontaine,* 382 N.W.2d 374 (N.D. 1986); *State v. Buell,* 22 Ohio St.3d 124, 489 N.E.2d 795 (1986); *Torres v. State,* 962 P.2d 3 (Okla.Crim.App.1998); *State v. Lawson,* 352 Or. 724, 291 P.3d 673 (2012) (en banc); *State v. Werner,* 851 A.2d 1093 (R.I.2004); *State v. Whaley,* 305 S.C. 138, 406 S.E.2d 369 (1991); *State v. McCord,* 505

N.W.2d 388 (S.D.1993); *State v. Copeland,* 226 S.W.3d 287 (Tenn.2007); *Weatherred v. State,* 15 S.W.3d 540 (Tex.Crim. App.2000); *State v. Clopten,* 223 P.3d 1103 (Utah 2009); *State v. Percy,* 156 Vt. 468, 595 A.2d 248 (1990); *Currie v. Commonwealth,* 30 Va.App. 58, 515 S.E.2d 335 (1999); *State v. Cheatam,* 150 Wash.2d 626, 81 P.3d 830 (2003) (en banc); *State v. Taylor,* 200 W.Va. 661, 490 S.E.2d 748 (1997); *State v. Shomberg,* 288 Wis.2d 1, 709 N.W.2d 370 (2006); *Engberg v. Meyer,* 820 P.2d 70 (Wyo.1991).

Moreover, all federal circuits that have considered the issue, with the possible exception of the 11th Circuit, have embraced this approach. *Compare United States v. Rodriguez–Berrios,* 573 F.3d 55 (1st Cir.2009); *United States v. Lumpkin,* 192 F.3d 280 (2d Cir.1999); *United States v. Brownlee,* 454 F.3d 131 (3d Cir.2006); *United States v. Harris,* 995 F.2d 532 (4th Cir.1993); *United States v. Moore,* 786 F.2d 1308 (5th Cir. 1986); *United States v. Smithers,* 212 F.3d 306 (6th Cir.2000); *United States v. Bartlett,* 567 F.3d 901 (7th Cir.2009); *United States v. Martin,* 391 F.3d 949 (8th Cir.2004); *United States v. Rincon,* 28 F.3d 921 (9th Cir.1994); *United States v. Rodriguez–Felix,* 450 F.3d 1117 (10th Cir.2006); *United States v. Smith,* 621 F.Supp.2d 1207 (M.D.Ala.2009) (Eleventh Circuit) (determining district court may admit testimony concerning eyewitness identification) *with United States v. Smith,* 122 F.3d 1355, 1358 (11th Cir.1997) (finding district court did not abuse its discretion when excluding expert on eyewitness testimony and declining to decide whether *per se* inadmissibility rule remained in effect).

Of the remaining jurisdictions that have addressed the issue, only Pennsylvania, Kansas, and Louisiana continue to adhere to a *per se* exclusionary approach to the admission of expert testimony regarding eyewitness identification. *State v. Gaines,* 260 Kan. 752, 926 P.2d 641 (1996); *State v. Young,* 35 So.3d 1042 (La.2010); *Simmons, supra.*

Recent state high court decisions make manifest the movement towards abandoning an absolute exclusion approach in favor of a discretionary approach to the admission of expert testimony regarding eyewitness identification. *Guilbert,* 306

Conn. 218, 49 A.3d 705 (2012) (undertaking encyclopedic review of topic and overruling prior precedent prohibiting expert testimony on eyewitness identification based upon extensive and comprehensive scientific research on fallibility of eyewitness identification); *Clopten,* 223 P.3d 1103 (Utah 2009) (recognizing decades of study established fallibility of eyewitness testimony, that jurors are unaware of such deficiencies, and that such expert testimony will assist trier of fact); *People v. LeGrand,* 8 N.Y.3d 449, 835 N.Y.S.2d 523, 867 N.E.2d 374, 380 (2007) (finding ban on expert testimony inappropriate due to advances in scientific research); *State v. Copeland,* 226 S.W.3d 287 (Tenn.2007) (overruling prior categorical ban on expert testimony based upon advances in field of eyewitness identification, inadequacy of cross-examination and jury instructions; and ability of trial court to evaluate admissibility of expert testimony); *Commonwealth v. Christie,* 98 S.W.3d 485 (Ky.2002) (highlighting number of courts that have held expert testimony should be admitted when no other inculpatory evidence presented); *State v. Schutz,* 579 N.W.2d 317 (Iowa 1998) (concluding impressive studies regarding eyewitness identification required reversal of per se rule of exclusion). Thus, since the mid–1990s, the unmistakable trend has been away from an absolute ban on expert testimony in this area and the vast majority of jurisdictions now allow the admissibility of expert testimony on eyewitness reliability at the discretion of the trial court.

With an understanding of the significant empirical research and the clear trend of jurisdictions towards the admission of expert testimony on eyewitness identification at the discretion of the trial court, we turn to the concerns expressed by our Court regarding the credibility-determining role of the jury and the existence of adequate alternatives to the use of expert testimony regarding eyewitness identifications.

The underpinnings of our current ban on expert testimony in the area of eyewitness reliability, and the primary reason offered by the Commonwealth, as noted above, is that the admission of such testimony will invade the province of the jury in making credibility determinations and provide an

unwarranted appearance of authority on the subject of credibility.

■ Expert testimony on relevant psychological factors which may impact eyewitness identification, however, does not directly speak to whether a particular witness was untrustworthy, or even unreliable, as the expert is not rendering an opinion on whether a specific witness is accurate in his or her identification. Rather, such testimony teaches—it provides jurors with education by which they assess for themselves the witness's credibility. In light of demonstrated misconceptions that jurors and other lay persons may possess regarding the infallibility of eyewitness identification, and ideas contrary to "common sense," such as the correlation between certainty and accuracy, use of expert testimony in appropriate cases will permit jurors to engage in the process of making credibility determinations with full awareness of limitations that eyewitness testimony may present. Moreover, while the Commonwealth claims that expert testimony would speak to a class of witnesses, causing the jury to defer to the expert and to give the expert an unwarranted appearance of authority, the focus is on factors that jurors may be unaware, and will potentially enhance their ability to render a just decision. Indeed, as expressed by the Supreme Court of Utah, "expert testimony does not unfairly favor the defendant by making the jury skeptical of all eyewitnesses. In fact, when a witness sees the perpetrator under favorable conditions, expert testimony actually makes jurors more likely to convict. When expert testimony is used correctly, the end result is a jury that is better able to reach a just decision." *Clopten*, 223 P.3d at 1109.

Numerous cases have rejected this basis for banning expert testimony in this area for these same reasons. *See, e.g., United States v. Hines*, 55 F.Supp.2d 62, 72 (D.Mass.1999) ("Nor do I agree that this testimony somehow usurps the function of the jury. The function of the expert here is not to say to the jury—'you should believe or not believe the eyewitness.' ... All that the expert does is provide the jury with more information with which the jury can then make a more informed decision."); *People v. McDonald*, 37 Cal.3d 351, 208

Cal.Rptr. 236, 690 P.2d 709, 722 (1984) (quoting Dean Wigmore, and referring to expert psychological evidence on eyewitness identification, "the objection [to such expert testimony] based upon the 'province of the jury' is no more than a shibboleth which, if accepted, would deprive the jury of important information useful and perhaps necessary for a proper decision on a difficult issue;" "Nor could [expert testimony] in fact usurp the jury's function. As is true of all expert testimony, the jury remains free to reject it entirely after considering the expert's opinion, reasons, qualifications, and credibility." (citations omitted)).

Moreover, our Rules of Evidence expressly contemplate just such a limited role for an expert, a role that does not impact credibility determinations. Specifically, the comment to Rule 702 makes clear that "[m]uch of the literature assumes that experts testify only in the form of an opinion. The language 'or otherwise' reflects the fact that experts frequently are called upon to educate the trier of fact about the scientific or technical principles relevant to the case." Pa.R.E. 702 cmt. The comment to Pa.R.E. 702 refers to the comments to Federal Rule of Evidence 702, which further explains, "[a]n intelligent evaluation of facts is often difficult or impossible without the application of some scientific, technical or other specialized knowledge[;] . . . The rule accordingly recognizes that an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts." F.R.E. 702 cmts.

Expert testimony on relevant factors concerning eyewitness identification would not speak specifically to the legitimacy of the victim's identification, or pass directly on the veracity of a particular witness, but would provide a background against which the jury could assess various factors concerning eyewitness identification at issue in the case. Consequently, rather than inviting the jury to abdicate its responsibility, as asserted by the Commonwealth, such expert testimony would merely assist the jury in understanding the factors impacting eyewitness identification testimony. Thus, with respect to the area

of eyewitness identification, we, like nearly all other courts, reject the rationale underlying the categorical ban on expert testimony: that such testimony constitutes an impermissible invasion of the jury's credibility making determination.[9]

Our prior decisions, and the Commonwealth, also offer that cross-examination coupled with closing arguments, is sufficient to convey the possibility of mistaken identification to the jury,

9. The Commonwealth relies on the Martire and Kemp article to support its argument that the absolute ban against expert evidence concerning eyewitness identification should remain because studies have not confirmed that such testimony results in the jury, in essence, arriving at a correct decision. The Commonwealth's reliance on this article is misplaced. A close review of the Martire and Kemp article undercuts the Commonwealth's broad claims that expert testimony in this area is unreliable and that we should maintain the absolute ban on such testimony. Specifically, citing the article, the Commonwealth asserts that only "3 of 24 studies have produced any kind of positive result, and only 1 of 24 ... produced a significant positive result." Commonwealth Sur–Reply Brief at 5. Yet, the authors of the article specifically rejected 21 of the 24 studies reviewed as methodologically unable to accurately test for juror accuracy. Martire and Kemp at 28–29, 31–33. Thus, according to the authors themselves, just three of the studies reviewed employed a methodology which could properly determine juror accuracy; of these three studies, one established that expert testimony can significantly improve a juror's ability to discriminate between accurate and inaccurate eyewitness identifications. According to the authors, the other two studies, which were subject to the peer review process, including the authors' own 2009 study discussed below, did not provide "evidence that the testimony of an eyewitness expert significantly improved juror ability to discriminate accurate from inaccurate identifications." *Id.* at 33. Yet, the authors' earlier conclusion is important: "Further investigations applying this methodology are clearly necessary in order to determine whether the single observed instance of improved [sensitivity to eyewitness accuracy] is the exception or the rule." *Id.* at 32. In short, the Martire and Kemp article, another important piece of scholarship in this field, recommends additional study, and does not *ipso facto* mandate the continued imposition of a ban on expert testimony in this area, especially in light of the experience of virtually all jurisdictions which have considered this issue. Finally, and related thereto, the Martire and Kemp article, to a large extent, relies upon a prior article published by these same authors two years earlier, in which they conclude the impact of expert evidence was not significantly different from that of focused jury instructions. Martire and Kemp, The Impact of Eyewitness Expert Evidence and Judicial Instruction on Juror Ability to Evaluate Eyewitness Testimony, 33 Law and Human Behavior 225, 234 (2009). Thus, based upon the Martire and Kemp articles, the preference for jury instructions proffered in the dissents of Chief Justice Castille and Justice Eakin is potentially called into question.

and, thus, is a basis to categorically exclude expert testimony on eyewitness identification.

While cross-examination and advocacy in closing argument may be common methods to unearth falsehoods and challenge the veracity of a witness, it is less effective in educating the jury with respect to the fallibility of eyewitness identification. *See Guilbert,* 49 A.3d at 725 ("cross-examination is far better at exposing lies than at countering sincere but mistaken beliefs"). This is especially true when cross-examining a neutral, credible, and confident witness before a jury, which may overestimate the veracity and reliability of eyewitness identification. *See generally* Jules Epstein, The Great Engine That Couldn't: Science, Mistaken Identity, and the Limits of Cross-Examination, 36 Stetson L.Rev. 727 (2007). Indeed, such information would not be within the permissible scope of cross-examination. If permitting expert testimony on relevant factors impacting eyewitness identification does not go to credibility, but to educating the jury, and if such factors are possibly not known or understood, or even misunderstood, by jurors, then the more effective way of educating the jury is not through the eyewitness him or herself, but through the presentation of such testimony by an expert when appropriate.

Again, numerous courts have rejected the preclusion of expert testimony on relevant factors concerning eyewitness identification simply on the basis that cross-examination is available. *See, e.g., Guilbert,* 49 A.3d at 725–26 (collecting cases); *Clopten,* 223 P.3d at 1110; *Copeland,* 226 S.W.3d at 300 (cross-examination insufficient to educate the jury on aspects of eyewitness identification).

Thus, we reject reliance upon cross-examination and closing arguments as sufficient to convey to the jury the possible factors impacting eyewitness identification and as justification for an absolute bar of such expert testimony, and recognize the potential advantages of expert testimony as a means to assist the jury where mistaken identity is a possibility. *See Clopten,* 223 P.3d at 1110 ("Even if cross-examination reveals

flaws in the identification, expert testimony may still be needed to assist the jury").[10]

**10.** For similar reasons, a *Kloiber* instruction would not serve as a sufficient reason to deny categorically the use of expert testimony in appropriate cases. A *Kloiber* instruction warns jurors that they should receive evidence of eyewitness identification with caution where: "the witness is not in a position to clearly observe the assailant, or he is not positive as to identity, or his positive statements as to identity are weakened by qualification or by failure to identify [the] defendant on one or more prior occasions." *Commonwealth v. Kloiber*, 378 Pa. 412, 424, 106 A.2d 820, 826–27 (1954). Yet, factors such as cross-racial identification, weapons focus, stress, or correlation between confidence and accuracy of identification are divorced from the compromised position of the witness, his or her lack of positive identification, or any expressed qualification of statements regarding identification. In his dissent, Chief Justice Castille, suggests unspecified revision to the existing *Kloiber* instruction; yet, for the above-noted reasons, such revisions would entail a complete remaking, rather than a mere re-working, of the instruction.

Related thereto, and regarding jury instructions generally, Justice Eakin, in his dissent, initially embraces the rationale underlying the absolute bar against expert testimony, positing such testimony would necessarily suggest an unwarranted "appearance of authority" on the subject of credibility; but, Justice Eakin goes on to suggest using jury instructions to convey the same information, thus, giving it *actual* authority. If one holds to the premise that such information impermissibly intrudes upon the jury's credibility making function, it is difficult to understand such information, coming from a judge by way of instructions, would have less of an impact on the credibility function of the jury. *See* Commonwealth Sur–Reply Brief at 15 ("Since the Commonwealth considers defendant's proffered expert testimony false and misleading, it obviously will not stipulate to his expert's testimony, much less to a judicial endorsement of his expert's testimony").

Indeed, our modification of an absolute ban on expert testimony in this area and an opening of the door to its use in appropriate cases, after passing the rigors of a *Frye* hearing, is a more conservative approach than that offered by Justice Eakin, who would have a judge, a neutral vested in actual authority, explain to the jury the possible shortcomings in eyewitness identification through jury instructions. *See Henderson*, 27 A.3d at 924 (directing that, in addition to the existing allowance of expert testimony at the discretion of the trial judge, enhanced instructions be given to educate juries regarding various factors that could impact reliability of identification in a given case); Supreme Judicial Court Study Group on Eyewitness Evidence, Report and Recommendation to the Justices, July 25, 2013 (Massachusetts' study group comprised of prosecutors, police, academics, attorneys, and judges, recommending, in addition to the allowance of expert testimony, *inter alia*, specific instructions regarding eyewitness identification in certain circumstances designed to guide jurors).

Moreover, while jury instructions may serve as another possible manner of informing the jury of factors potentially influencing eyewitness

Finally, although not serving as an underpinning for our prior decisions in upholding an absolute ban on expert testimony regarding eyewitness identification, the Commonwealth raises numerous practical concerns to permitting such testimony. These include the possibility of the use of such expert testimony in numerous cases, the cost of allowing expert testimony, possible claims of ineffectiveness for failing to obtain an expert, and trials becoming a "battle of the experts," not only on questions of eyewitness identification, but also on related issues as well.

■ Initially, we envision that allowing such expert testimony would be limited to certain cases. As discussed below, such testimony would only be permitted where relevant. Pa. R.E. 401. While we need not precisely define such situations, generally speaking, it would be where the Commonwealth's case is solely or primarily dependent upon eyewitness testimony. Thus, contrary to the Commonwealth's suggestion that permitting expert testimony would impact thousands of cases, we believe the scope of removing the *per se* ban on such testimony would be limited, and, again, at the discretion of the trial judge. Second, there is a monetary cost for all tools used to achieve justice, including trial by jury. Moreover, the collective experience of the vast majority of state and federal jurisdictions that permit expert testimony appears to be that the ability to proffer such testimony has not placed an undue burden on the court system, either at trial or on collateral review, and the Commonwealth has cited no specific examples. Finally, the limited use of expert testimony regarding eyewitness identification will allow and may well encourage the

identification, *Henderson, supra,* like all options, jury instructions have their own shortcomings, and for purposes of our decision today, the possibility of instructions should not serve to categorically prohibit expert testimony. *See Clopten,* 223 P.3d at 1110–11 (finding cautionary instructions are inadequate at educating jury regarding mistaken identifications, *inter alia,* as instruction may be buried in overall charge, come at end of trial, days after witness testifies, and fail to explain how certain factors impacting eyewitness identification occur or to what extent); *Copeland,* 226 S.W.3d at 300 ("research also indicates that neither cross-examination nor jury instructions on the issue are sufficient to educate the jury on the problems with eyewitness identification").

Commonwealth to proffer its own experts, but as noted above, if proper, such expert testimony will merely provide the jury with additional knowledge with which the jury can then make a more informed decision.

We find that the use of expert testimony regarding eyewitness testimony when relevant does not improperly intrude upon the jury's credibility determinations and that cross-examination of a witness, and closing argument, are insufficient to convey factors regarding the fallibility of eyewitness identification to the jury. Coupled with the ground swell of empirical studies and research on factors influencing eyewitness identification, as well as the substantial acceptance nationally of expert testimony regarding eyewitness identification, we believe an absolute ban on expert testimony in this area is no longer the best approach in determining how to assist the finder of fact where mistaken identification is at issue. Importantly, our decision today is limited to this unique area of the law, where, as noted above, the case law from other jurisdictions and the research is compelling. Thus, we believe that it is time to take the step of joining those jurisdictions which allow the admission of expert testimony on relevant factors concerning eyewitness identification, at the discretion of the trial court, subject to an abuse of discretion appellate standard of review.

Some further aspects of our limited decision to reject the *per se* ban on expert testimony regarding eyewitness identification require additional comment. As noted above, to be admissible under Pa.R.E. 702, proffered expert testimony must also address matters "beyond [the knowledge] possessed by the average layperson."

Expert testimony is admissible in all cases, civil and criminal alike, "when it involves explanations and inferences not within the range of ordinary training knowledge, intelligence and experience." *Commonwealth v. Leslie*, 424 Pa. 331, 334, 227 A.2d 900, 903 (1967). As noted above, eyewitness identification can be extremely powerful testimony; yet, its limits often are not understood by jurors. Studies have

concluded that jurors misunderstand the accuracy of eyewitness identification. *See, e.g.,* Elizabeth F. Loftus, et. al., Juror Understanding of Eyewitness Testimony: A Survey of 1000 Potential Jurors in the District of Columbia, 46 Jurimetrics J. 177 (2006); Handberg, Expert Testimony on Eyewitness Identification: A New Pair of Glasses for the Jury, 32 Am.Crim. L.Rev. 1013 (1995).

Case law reflects the same concerns. *See, e.g., Guilbert,* 49 A.3d at 723 (offering that scientific findings regarding eyewitness testimony "are largely unfamiliar to the average person, and, in fact, many of the findings are counterintuitive." (footnote omitted)); *Clopten,* 223 P.3d at 1108 ("there is little doubt that juries are generally unaware of these deficiencies in human perception and memory"); *Copeland,* 226 S.W.3d at 300 (finding jurors for most part unaware of problems in eyewitness identifications); *Newsome v. McCabe,* 319 F.3d 301, 305 (7th Cir.2003) ("Jurors, however, tend to think that witnesses' memories are reliable (because jurors are confident of their own), and this gap between the actual error rate and the jurors' heavy reliance on eyewitness testimony sets the stage for erroneous convictions"); *United States v. Smithers,* 212 F.3d 306, 312 n. 1, 316 (6th Cir.2000) ("Today, there is no question that many aspects of perception and memory are not within the common experience of most jurors, and in fact, many factors that affect memory are counter-intuitive;" "Jurors tend to overestimate the accuracy of eyewitness identifications because they do not know the factors they should consider when analyzing this testimony."); *see also United States v. Brownlee,* 454 F.3d 131, 142 (3d Cir.2006) ("jurors seldom enter a courtroom with the knowledge that eyewitness identifications are unreliable" (citations omitted)).

Thus, we observe that the potential fallibility of eyewitness identification is "beyond [the knowledge] possessed by the average layperson," Pa.R.E. 702, indeed, may be counterintuitive, and so conclude that expert testimony on that subject could potentially assist the trier of fact to understand the evidence or determine a question of fact at issue. Stated another way, in light of the concerns identified by researchers

and other courts, we are no longer willing to maintain a preclusive rule based on equating common knowledge among jurors with a developed understanding of the factors which potentially impact eyewitness testimony.

Factors at issue in this appeal—concerning weapons focus; the reduced reliability of identification in cross-racial identification cases; decreased accuracy in eyewitness identifications in high-stress/traumatic situations; the risk of mistaken identification when police investigators do not warn a witness, prior to viewing a photo array or line up, that the perpetrator may or may not be in the display; and the lack of correlation between witness statements of confidence and witness accuracy—all are topics which the average juror may know little about. Thus, in light of misconceptions ordinary individuals may possess regarding eyewitness testimony, and its presumption of reliability, we conclude that, as a general proposition, the particular area of expert testimony at issue in this appeal may be beyond the ken of the average juror, and thus, as a threshold matter, possibly subject to expert testimony.

Next, under Pa.R.E. 702, such testimony must "help the trier of fact to understand the evidence or determine a fact in issue." Pa.R.E. 702. As noted above, in light of misconceptions that jurors and other lay persons may possess regarding the infallibility of eyewitness identification, use of expert testimony in appropriate cases would permit jurors to make credibility determinations with full awareness of the limitations that eyewitness testimony may present, and, thus, assist the trier of fact in understanding the evidence. Again, such expert testimony, when appropriate, can provide salutary educational value to the jurors in their credibility-determining function.

However, to be admissible under Rule 702, evidence must not only be beyond the knowledge possessed by layperson, and assist the trier of fact to understand the evidence, but it also, as noted above, must pass the *Frye* "general acceptance" test.

The *Frye* test provides that novel scientific evidence is admissible "if the methodology that underlies the evidence has general acceptance in the relevant scientific community." *Grady v. Frito–Lay, Inc.*, 576 Pa. 546, 555, 839 A.2d 1038, 1044 (2003). The *Grady* Court reasoned that scientists are in a better position to evaluate the merits of scientific theory and techniques than judges. With respect to application of the *Frye* standard, our Court has "made it clear that *Frye* is not implicated every time science comes into the courtroom; rather, it applies only to proffered expert testimony involving novel science." *Commonwealth v. Dengler*, 586 Pa. 54, 69, 890 A.2d 372, 382 (2005); *see also Grady*, 576 Pa. at 557, 839 A.2d at 1045 (finding *Frye* is applicable to novel science, as well as where scientific methods are utilized in novel way). Our Court has noted that "a reasonably broad meaning should be ascribed to the term 'novel,'" and "a *Frye* hearing is warranted when a trial judge has articulable grounds to believe that an expert witness has not applied accepted scientific methodology in a conventional fashion in reaching his or her conclusions." *Betz v. Pneumo Abex LLC, et al.*, 615 Pa. 504, 545–46, 44 A.3d 27, 53 (2012). Further, what constitutes novel scientific evidence is usually decided on a case-by-case basis as there is some flexibility in the construction, as "science deemed novel at the outset may lose its novelty and become generally accepted in the scientific community at a later date, or the strength of the proponent's proffer may affect the *Frye* determination." *Dengler*, 586 Pa. at 69–70, 890 A.2d at 382. As we noted in *Dengler*:

Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

*Id.* at 67–68, 890 A.2d at 380–81 (quoting *Frye* ) (citation omitted).

Once determined to be novel evidence, under *Frye,* the proponent must show that the methodology is generally accepted by scientists in the relevant field, but need not prove the conclusions are generally accepted. *Grady,* 576 Pa. at 558, 839 A.2d at 1045. The burden of proof under the test is borne by the proponent of the scientific evidence, who, again, must establish all the elements for the testimony to be admitted under Pa.R.E. 702, including satisfaction of the *Frye* test.

While numerous *Frye* jurisdictions have accepted eyewitness identification expert testimony as being admissible under the *Frye* standard, the Commonwealth has raised sufficient questions about certain methodology in this area to warrant further inquiry by the trial court through a *Frye* hearing. This is especially true here, in light of the trial court's denial of a *Frye* hearing due to our prior case law which categorically banned expert testimony regarding eyewitness identification, but which we reconsider and reject today, and given that the determination of the need for a *Frye* hearing is for the trial court in the first instance and to be assessed on a case-by-case basis. *Grady.* Accordingly, we remand this matter to the trial court for a determination of the appropriateness of a *Frye* hearing, consistent with our decision today.

Finally, the trial court considered Pa.R.E. 401 and 403, which require that all evidence be relevant and that the probative value outweigh its danger of unfair prejudice. The trial court determined that the proffered evidence regarding eyewitness identifications had no bearing on whether the eyewitnesses testifying were mistaken in this case. Thus, such testimony, according to the trial court, did not make the fact of the eyewitnesses' identification more or less probable than without it. According to the trial court, even assuming that the expert's testimony met the threshold for relevance, the court believed that the probative benefit of such testimony was nominal, as several witnesses identified Appellant, and

their encounters with him were more than brief. The Commonwealth too submits that the admission of expert testimony in the area of eyewitness identification is irrelevant and will cause jury confusion.

Relevance is defined as evidence having "any tendency to make a fact more or less probable that it would be without the evidence; and the fact is of consequence in determining the action." Pa.R.E. 401(a),(b). Here, there was no direct evidence against Walker other than eyewitness identifications. Thus, the eyewitness identifications were central to Walker's conviction. Moreover, Appellant was the subject of cross-racial identification, made by witnesses that were under stress, and who were robbed at gunpoint. The police in this appeal did not instruct the witnesses when viewing the array that their assailant may or may not have been included in the array, and finally, while one witness equivocated during her identification of Appellant during the array and lineup, she declared with confidence her identification at trial. Importantly, the trial court's determination regarding relevancy and probative value were made against the backdrop of our mid-1990s decisions banning such eyewitness identification expert testimony *in toto,* and without consideration of the authority we discuss above. Thus, we believe at least in these limited circumstances, expert testimony on these aspects of eyewitness identification could be highly relevant.

Furthermore, even if relevant, evidence may be excluded "if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. For the reasons more fully explained above, we do not believe that such expert testimony, where relevant, should be *per se* excluded on this basis and merely because the trial might be simpler without it. Nor are we of the opinion that such evidence, viewed generally, will confuse jurors. Obviously, the trial court will be able to control and limit the presentation of expert testimony in this regard. Finally, even though more than one eyewitness was involved in this appeal, we question

the trial court's determination that such testimony would be only nominally valuable, and are satisfied that expert testimony regarding eyewitness identification in these circumstances could be probative and beneficial to the jury. Thus, upon remand, the trial court is instructed to reconsider its prior determinations in light of our opinion today.

In conclusion, we believe, that in light of the magnitude of scientific understanding of eyewitness identification and marked developments in case law during the last 30 years, it is no longer advisable to ban the use of expert testimony to aid a jury in understanding eyewitness identification. The absolute prohibition of such expert testimony simply proves too extreme an approach in determining whether relevant testimony should be admitted in this area. A more flexible framework strikes a crucial balance in determining the admission of expert testimony, as well as between protecting a defendant's rights while enabling the Commonwealth to meet its responsibility of protection of the public. While the general principles regarding expert testimony offered in *Abdul–Salaam, Simmons,* and *Spence* remain valid, the specific holdings in those cases barring expert testimony concerning the specific area of eyewitness identification are inconsistent with our opinion today, and, thus, are so limited. We now allow for the possibility that such expert testimony on the limited issue of eyewitness identification as raised in this appeal may be admissible, at the discretion of the trial court, and assuming the expert is qualified, the proffered testimony relevant, and will assist the trier of fact. Of course, the question of the admission of expert testimony turns not only on the state of the science proffered and its relevance in a particular case, but on whether the testimony will assist the jury. Trial courts will exercise their traditional role in using their discretion to weigh the admissibility of such expert testimony on a case-by-case basis. It will be up to the trial court to determine when such expert testimony is appropriate. If the trial court finds that the testimony satisfies *Frye,* the inquiry does not end. The admission must be properly tailored to whether the testimony will focus on particular characteristics of the identi-

fication at issue and explain how those characteristics call into question the reliability of the identification. We find the defendant must make an on-the-record detailed proffer to the court, including an explanation of precisely how the expert's testimony is relevant to the eyewitness identifications under consideration and how it will assist the jury in its evaluation. The proof should establish the presence of factors (e.g., stress or differences in race, as between the eyewitness and the defendant) which may be shown to impair the accuracy of eyewitness identification in aspects which are (or to a degree which is) beyond the common understanding of laypersons.

Finally, we embrace the extensive research and studies noted above (and the experience of all or nearly all federal circuits, 44 states, and the District of Columbia) only to the extent they serve as a foundation to highlight a significant problem in our criminal justice system regarding eyewitness identification and to support modification of the current absolute ban of any expert testimony in this limited area. What we do is remand for the possibility of a *Frye* hearing in this matter, leaving open admissibility questions such as relevance and probative value. Indeed, in his dissent, Chief Justice Castille's characterization of this Court as accepting as "definitive" the research and studies noted above, misapprehends the nature of our determination today. What the dissent does not acknowledge is that an absolute ban on expert testimony is the exception to our otherwise accepted process of allowing expert testimony, where a trial court, in performing its gate-keeping function, deems it to be appropriate. Instead, the advent of DNA evidence, as well as hundreds of studies and the experience of virtually all jurisdictions that have entertained the issue, have highlighted the potential of expert eyewitness identification testimony in certain situations and the possible educational value of expert testimony, rendering the absolute bar on this evidence no longer supportable. Indeed, Chief Justice Castille in his dissent appears to be in a somewhat similar posture to that of the majority—a remand to treat the request for the use of expert testimony regarding discrete aspects of eyewitness identification as a request regarding

expert testimony in any other area of the law. Castille, C.J. Dissenting Opinion at 495–98, 92 A.3d at 794–95.[11]

11. Also, Chief Justice Castille, in his dissent, resists eliminating the current absolute bar of expert testimony in this area by offering a number of traditional and often-used arguments. *See* Harris, Failed Evidence, Why Law Enforcement Resists Science (New York University Press 2012). These arguments include cost, the charge that anything other than an absolute bar will let the guilty escape, and that such a move will allow the defense bar to assist defendants in escaping punishment.

Specifically, Chief Justice Castille, and Justice Eakin in his dissent, asserts that modifying the absolute ban will involve monetary costs, including those to the local court system. There are, however, costs to wrongful convictions, not discussed by the dissenters, if the problems regarding eyewitness identifications are not addressed. Indirect costs for wrongful convictions, as noted above, include suffering on the part of the innocent individual and his or her family, and trauma to the victim or witness, due to the guilt of convicting an innocent person. Finally, there is a societal cost when the criminal who perpetrated the crime remains at large with a chance to continue committing crimes. Moreover, Chief Justice Castille, by offering his dire prediction that today's decision will permit "thousands" of violent criminals to "walk away scot-free," merits little comment, as it fails to give credit to our jurors, our traditional adversarial system, or the limited circumstances in which such testimony may be used, and the 44 states and federal jurisdictions who have permitted expert testimony in this limited area. Related thereto, Chief Justice Castille suggests that our modification to the absolute bar on expert testimony merely benefits the defense bar. Yet, while defense counsel must zealously advocate on behalf of his or her client, the prosecution owes a duty to not only prosecute for the Commonwealth, but also to do justice. An "us-versus-them" perspective regarding the possible allowance of expert testimony in this area improperly discounts the benefit to both defense and prosecution, including, possibly educating jurors about aspects of positive eyewitness identification by a victim and identification of an alternative perpetrator by the defense, as well as the overarching goal of avoiding miscarriages of justice. Indeed, contrary to the dissent's view, law enforcement agencies, prosecutors, courts, and legislatures have begun to recommend a variety of modifications, including the use of expert testimony. *See, e.g.,* Supreme Judicial Court Study Group on Eyewitness Evidence, Report and Recommendation to the Justices, *supra* (study group comprised of judges, police officials, academics, and prosecutors setting forth various recommendations to Supreme Court of Massachusetts regarding eyewitness identification, including the use of expert testimony at trial).

Ultimately, many of the questions the dissent raises will be addressed through case-by-case development—the traditional process for changes in the law. Related thereto, while claiming that we have failed to give sufficient guidance to our trial judges, we are confident they are more than capable of dealing with the various issues that may arise regarding

Thus, we hold that the admission of expert testimony regarding eyewitness identification is no longer *per se* impermissible in our Commonwealth, and join the majority of jurisdictions which leave the admissibility of such expert testimony to the discretion of the trial court. We reverse the order of the Superior Court which, based upon our prior case law, banned this type of testimony. As the trial court determined that a *Frye* hearing was not permissible, relying upon our prior case law, we remand to the trial court for full consideration of such expert testimony, including the possibility of a *Frye* hearing, consistent with our decision today.[12]

Former Justice ORIE MELVIN did not participate in the decision of this case.

Justices SAYLOR, BAER and McCAFFERY join the opinion.

Chief Justice CASTILLE files a dissenting opinion.

Justice EAKIN files a dissenting opinion in which Chief Justice CASTILLE joins.

Chief Justice CASTILLE, dissenting.

I respectfully dissent and I also join Mr. Justice Eakin's Dissenting Opinion.

In abandoning the existing exclusion of expert testimony regarding the reliability of eyewitness identification, the Majority Opinion: (1) accepts dubious external literature and sources as settled "science" in the absence of a factual determination below (or anywhere, it appears), and despite the "science" being specifically contested by the Commonwealth;

the introduction of expert testimony in this area, just as they ably have done so in other areas in which expert testimony has been permitted.

**12.** In light of our decision today, we need not presently address Appellant's one-page argument regarding a constitutional right to present expert testimony in these circumstances under the Sixth Amendment to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution. *See Mt. Lebanon v. County Bd. of Elections,* 470 Pa. 317, 322, 368 A.2d 648, 650 (1977) (finding court should not decide constitutional question unless absolutely required to do so).

(2) fails to meaningfully justify its preference for institutionalizing a requirement for costly and generic expert "scientific" testimony, especially in light of obvious practical difficulties; and (3) fails to provide any practical guidance to trial courts regarding how they may wield their new-found discretion in this allegedly "scientific" arena in a fashion that is other than arbitrary. Make no mistake about it, the effect of the no-record "scientific" conclusion here will be to ensure that some of the most brazen of criminals—perpetrators of stranger-upon-stranger violent crime—will walk away scot-free, all because of the generic opinion of some on-call social-scientific "expert" on a matter that can be explored by ordinary trial means (effective cross-examination and specific jury instruction) and decided by ordinary jurors, as the record in this very case makes abundantly clear. I cannot sign on to the Majority's enshrinement of this contested social science in these circumstances.

Preliminarily, it is worth noting that not all disciplines self-denominated as scientific are as objectively reliable as others. A properly trained chemist can usually reliably explain the chemical composition of a substance, for example, without there being much room for debate. But studies of human beings, human nature, human perception, and human recollection inevitably have a heavy dose of subjectivity. Having been a trial lawyer for many years, I have some experience with issues affecting identification testimony, and I maintain some skepticism that the experts the Majority will now require the state to provide have more knowledge than, or can reliably guide a jury any better than, the process of cross-examination, closing argument, appropriate jury charges, and the collective jurors' own human experience and judgment. I am also skeptical, in the absence of any record demonstration and testing of the "science" proffered here, because the science happens to dovetail so nicely with the preferences of the criminal defense position. There is little reason, budget, or occasion, for example, for prosecution authorities to sponsor counter-studies. And, one can expect that, if and when these experts are permitted to testify for the defense, the defense closing will invariably proceed along the lines that the expert's

testimony alone creates reasonable doubt—irrespective of the facts of the case.

Of course, scientific advances occur and courts, when reliable science advances the pursuit of truth, should make accommodating adjustments. Cognizant that the trial court here had no obligation under existing law to put this "science" to an evidentiary test, I would have no objection to a remand for that purpose; that is a far better course than the Majority's rendering of a definitive academic judgment. (The Majority remands, but only for implementation of its predicate "scientific" holding that expert testimony in this area will actually assist jurors in carrying out their truth-determining function. As I explain below, the "research" supporting this conclusion is wanting.) [1] With that record in place, I would then proceed to a more grounded and balanced **legal** determination of whether to revisit our long-standing precedent in *Spence* and its progeny, and if so, to determine what is the best course going forward.[2] Respecting the latter point, I would consider more seriously than the Majority has, that if appellant, following a contested hearing, can in fact **prove** that there is some helpful accepted scientific consensus in this area—involving a complex variety of human beings responding in infinite ways—why subsidization of competing experts is required to convey the supposedly settled generic science. The more logical accommodation of the science the Majority has accepted is simply to revise the Court's time-tested *Kloiber*[3] charge to address established concerns regarding circum-

1. The Majority misstates my position in saying that I support remanding the case for a *Frye* hearing (*see Frye v. U.S.*, 293 F. 1013 (D.C.Cir. 1923)) "regarding discrete aspects of eyewitness identification." *See* Majority Op. at 493, 92 A.3d at 792. Rather, my position is that if the Court is inclined to entertain lifting our existing ban on such testimony, the appropriate threshold question on any remand should be whether expert testimony in this area is effective and should be admitted at all. But, the Majority has already answered that question, without an evidentiary examination below, and approved the "science" as a matter of law.

2. *See Commonwealth v. Spence*, 534 Pa. 233, 627 A.2d 1176 (1993); *Commonwealth v. Simmons*, 541 Pa. 211, 662 A.2d 621 (1995); and Commonwealth v. Abdul–Salaam, *544 Pa. 514, 678 A.2d 342 (1996)*.

3. Under *Commonwealth v. Kloiber*, 378 Pa. 412, 106 A.2d 820, 826–27 (1954), *cert. denied*, 348 U.S. 875, 75 S.Ct. 112, 99 L.Ed. 688 (1954), a

stances that may impair—or heighten—an eyewitness's relia-bility.[4]

## I. The Science

Foremost, I have deep concerns about the Majority's description and acceptance of what it calls "considerable empirical research" as definitive. It appears that the Majority's analysis largely follows lockstep the conclusions of other courts, with scant substantive evaluation of the "scientific" literature itself, resulting in a paucity of support for the Majority's ultimate legal determination. The Majority begins its analysis by correctly noting that our existing ban of expert testimony regarding eyewitness reliability rests on the experience-based notion that such testimony creates an "unwarranted appearance of authority invading the province of the jury's credibility determination," and that there exist "alternative means of challenging the reliability of eyewitness testimony[.]" Majority Op. at 475, 92 A.3d at 781. The Majority then asserts that "science" has changed everything, because our prior precedent "did not consider or mention the advent of scientific research on the issue of reliability of eyewitness testimony or the experience of other jurisdictions on this topic. Thus … it is important to recognize the considerable empirical research that has been conducted regarding eyewitness identification," as well as the extra jurisdictional decisional law admitting expert testimony. *Id.* at 475, 92 A.3d at 781.

So then, reliability is the polestar, as it should be in the quest for truth. But, how does this "science" promise to enhance the search for reliability? And, does the Majority's framing of the appropriate manner in which the expert testimony should proceed better ensure reliability? As always, the

charge that an eyewitness's identification should be viewed with caution is required where the eyewitness: (1) did not have an opportunity to clearly view the defendant; (2) equivocated on the identification of the defendant; or (3) had a problem making an identification in the past. *Commonwealth v. Ali,* 608 Pa. 71, 10 A.3d 282, 303 (2010).

4. As the Majority notes, as presented in this appeal, the issue centers on the memory accuracy of eyewitnesses who sincerely believe their identifications are correct.

devil is in the details—details not subjected to factual examination below and not fully appreciated by the Majority here.

By way of background, in this area of "science," we apparently have research, articles, and articles about research. The impressively labeled "empirical research" touted by the Majority references studies about how people respond to a variety of stimuli (*e.g.*, the studies seek to assess the accuracy of human memory under stress, or in the presence of a weapon, etc.); the articles try to create a bridge from the research and into the courtroom by explaining the expert's role of assisting the jury to carry out its truth-determining function when an eyewitness has encountered these stimuli.[5] The research no doubt supports the idea that there exist "an array of variables that are most likely to lead to a mistaken identification"—most trial lawyers and judges could tell you that. But, does the empirical research demonstrate the effectiveness of expert testimony at educating jurors in such a way that they will be better able to determine which identifications are reliable and which are not? It is on this point that there is a clear disconnect between the research the Majority embraces and the solution proposed within these articles, which the Majority accepts as grounded in settled scientific research.

The issue before this Court is not whether juries always appreciate factors that make eyewitness identifications more or less reliable—that some factors go unweighed by jurors is evident and likely inevitable. Rather, the question is whether the proffered expert testimony does anything to rectify this issue, in other words to ensure that identifications are more reliable. Surely, the point is not to convince juries to distrust

5. The Majority quotes *Connecticut v. Guilbert*, 306 Conn. 218, 49 A.3d 705, 720 (2012) for the proposition that "extensive and comprehensive scientific research, as reflected in hundreds of peer reviewed studies and meta-analyses, convincingly demonstrates the fallibility of eyewitness identification testimony and pinpoints an array of variables that are most likely to lead to a mistaken identification," and references Mark S. Brodin, *Behavioral Science Evidence in the Age of Daubert: Reflections of a Skeptic*, 73 U. Cin. L.Rev. 867, 889–90 (2005) (hereinafter "Brodin") to explain that experts can use the research to testify in court about the supposed limitations and weaknesses of eyewitness identification. Majority Op. at 475–76, 92 A.3d at 781–82.

all identifications, for the proffered "science" does not and cannot say that. However, does the science and process approved by the Majority create an "unwarranted appearance of authority invading the province of the jury's credibility determination[?]" Majority Op. at 475, 92 A.3d at 781; Commonwealth's Sur–Reply Brief at 2.

To be sure, understanding the proper role of the expert at trial is paramount. Proponents of admitting expert testimony in these cases explain that "[t]ypically, eyewitness experts are prepared to testify in court about the extent to which the research literature explains how a particular factor, considered alone or in combination with others, likely would affect the reliability of an identification." Richard S. Schmechel, Timothy P. O'Toole, Catharine Easterly, & Elizabeth F. Loftus, *Beyond the Ken? Testing Jurors' Understanding of Eyewitness Reliability Evidence*, 46 JURIMETRICS J. 177, 180 (1996). So far, the article tells us what should already be evident: that an expert is there to explain the research. But why is the expert necessary to explain the research? An article cited by the Commonwealth frames the question more accurately: If "'[t]he pyschologists' [sic] role as expert is to help the trier of fact reach an accurate conclusion about whether the eyewitness's testimony can be trusted in the instant case' . . . our evaluation should be made with regard to jurors' ability to discriminate accurate from inaccurate eyewitness testimony after hearing expert evidence." Kristy A. Martire & Richard I. Kemp, *Can Experts Help Jurors to Evaluate Eyewitness Evidence? A Review of Eyewitness Expert Effects*, 16 LEGAL AND CRIMINOLOGICAL PSYCHOLOGY 24, 25 (2011) (hereinafter "Martire & Kemp") (*quoting, in part,* R.O. Lempert, *Social Science in Court: On "Eyewitness Experts" and Other Issues*, 10 LAW AND HUM. BEHAV. 167, 172 (1986)).

The Majority, after being informed by what it evaluates as "an understanding of the significant empirical research and the clear trend of jurisdictions," eventually offers to rebut the core rationale of *Spence* by explaining its own unverified assumptions that: (1) the expert "merely assist[s] the jury in

understanding the factors" and providing a background against which the jury may assess them; (2) the expert testimony "would not speak to the legitimacy of the victim's identification or pass on the veracity of a particular witness"; and (3) the jury remains free to weigh and ultimately reject the testimony if it so chooses. Majority Op. at 480–81, 92 A.3d at 784–85.

However, I am not as convinced as the Majority that the paradigm it approves will result in an expert who would "educate" the jury by speaking of factors that would make an eyewitness more reliable. The science is grounded in negativity: at its essence is the concern that identifications are wrong or unreliable, and here are the reasons why they may be. But, there obviously are manifold instances of accurate identifications notwithstanding the stress factors the experts identify. How is such negative data, generically explained as the Majority proposes, supposed to help jurors separate the reliable from the unreliable? Are the experts, in their supposed roles as independent "educators" of the jury, as familiar with studies about positive factors as negative ones? Have studies of that type even been conducted? The authors cited by the Majority paint a noticeably one-sided picture.[6] Although the Majority claims that it can "envision" how this would proceed in our courts, I remain skeptical.

First, the Majority admonishes the Commonwealth for suggesting that an "informational cascade" could be the reason why so many jurisdictions have fallen for this expert testimony, rather than, for example, each jurisdiction independently reviewing and weighing the "scientific literature" on the subject. See Majority Op. at 469 n. 6, 92 A.3d at 778 n. 6. The Majority then proceeds to identify fifty-four jurisdictions (forty-four states and ten federal circuits) that have allowed this testimony, yet fails to independently evaluate any of the research itself because, I suppose, it hopes or assumes that

6. See Brodin, supra note 5, at 890 ("The expert is prepared to testify about the factors that adversely affect accuracy (for example, stress, "weapon focus," and confusion of post-event information) and to contradict assumptions likely to be shared by jurors, such as the equation of the witness's level of certainty with the accuracy of the identification.").

502

someone along the way knuckled down and did the hard work. *Id.* at 782–83 (stating, *inter alia,* that the Supreme Court of Connecticut engaged in an "encyclopedic review of [the] topic" in *State v. Guilbert,* 306 Conn. 218, 49 A.3d 705 (2012), and the Supreme Court of Utah "recogniz[ed] decades of study" in *State v. Clopten,* 223 P.3d 1103 (Utah 2009)). I understand the attraction of the lemmings to the sea approach, but I also try to keep in mind the cliff awaiting—especially in a case where we have no factual development and findings below, and the Commonwealth here has contested the issue. I also appreciate that the "science" can change and evolve as other studies are conducted, and as prosecution authorities come to realize the effect of the new evidence. It is notable that the Majority only once, and then parenthetically, alludes to research that may show whether expert testimony in this area may actually assist the trier of fact in distinguishing reliable from unreliable identifications. Majority Op. at 478, 92 A.3d at 783 (citing the Utah Supreme Court in *Clopten, supra* ). But, a review of the *Clopten* court's actual analysis reveals a grand total of three sentences dedicated to the subject,[7] followed by a citation to a near-twenty-year-old book by psychologists Brian L. Cutler & Steven D. Penrod [8]—a text which, for reasons I will explain below, should not so hastily receive any court's non-record-tested judicial *imprimatur.*

Second, the Majority's assurance that a jury will remain free to choose whether to accept or reject the testimony, and that the expert will not opine on the testimony in the instant case, skirts the underlying, valid concern addressed in *Spence.* The *Spence* rule's purpose is not to prevent an expert from opining on the ultimate decision for the jury, but the purpose

7. The *Clopten* court declared: "Importantly, expert testimony does not unfairly favor the defendant by making the jury skeptical of all eyewitnesses. In fact, when a witness sees the perpetrator under favorable conditions, expert testimony actually makes jurors more likely to convict. When expert testimony is used correctly, the end result is a jury that is better able to reach a just decision." 223 P.3d at 1109 (footnote omitted).

8. Brian L. Cutler & Steven D. Penrod, Mistaken Identification. The Eyewitness, Psychology and The Law 256 (1995) (hereinafter "Cutler & Penrod").

is to prevent undue prejudice by barring evidence presented under an improper air of authority that invades the jury's province. As the Supreme Court of Louisiana (one of the three remaining states to preclude expert testimony on this issue) explains:

[U]pon review, the touted advances in the social sciences regarding the validity of eyewitness identifications do not render obsolete the underlying premise for which such evidence was held to be inadmissible.... There is still a compelling concern that a potentially persuasive expert testifying as to the generalities of the inaccuracies and unreliability of eyewitness observations, that are already within a juror's common knowledge and experience, will greatly influence the jury more than the evidence presented at trial. By merely being labeled as a specialist in eyewitness identifications, an expert has the broad ability to mislead a jury through the "education" process into believing a certain factor in an eyewitness identification makes that identification less reliable than it truly is. Moreover, expert testimony on eyewitness identifications can be more prejudicial than probative because it focuses on the things that produce error without reference to those factors that improve the accuracy of identifications. The expert testimony presumes a misidentification, in the absence of presenting factors which support the validity of the identification. This fosters a disbelief of eyewitnesses by jurors.

*State v. Young*, 35 So.3d 1042, 1049–1050 (La.2010) (internal citations omitted); *see also Commonwealth v. Simmons*, 541 Pa. 211, 662 A.2d 621, 631 (1995); *accord* Commonwealth's Brief at 15–17 (citing Martire & Kemp, *supra*, which reviewed research in this area conducted since 1980, and concluded, *inter alia*, that most common effect of expert testimony is to make jurors more skeptical of **all** identifications, *i.e.*, identifications under both favorable and unfavorable conditions).

The Majority takes exception to the notion that relevant factors affecting the reliability of eyewitness identification are within the common knowledge and experience of the jury— indeed, its analysis is almost entirely dedicated to undermin-

ing that idea. But, the scientific literature is all about humanity, with all its limitations and its frailties. Before modern movements in psychiatry and psychology, mankind already had a rich literature laden with insight into humanity. A great deal of what is found in the work Freud, Jung, and others rang true to those who were already conversant in Shakespeare and ancient Greek drama. In short, matters affecting human perception and recall are hardly the exclusive and special bailiwick of social science experts.

Furthermore, the jury in every case receives an education—through the evidence, cross-examination, argument, and jury charges—on the issues to be tried. Judges instruct juries on matters that fall within the humanistic sciences, including on perceptions, motivations, etc.—like the *Kloiber* charge. Moreover, the question of whether every negative factor of concern to researchers interested in mistaken identification is within the jury's common knowledge does little to dispel the likelihood that this expert testimony will do more harm than good in assisting a jury to **distinguish** reliable from unreliable identifications. Notably, the Commonwealth here contends that the American Psychological Association ("APA"), in their *amicus* brief, selectively ignore more modern studies that show that expert testimony on eyewitness reliability increases juror skepticism and juror confusion, and that such testimony "is more than twice as likely to cause unfair prejudice to the prosecution as it is to fairly help the jury." Commonwealth's Brief at 16–17 & n. 16 (citing Martire & Kemp, *supra* ).[9] The parties obviously view the literature in this area very differently; there are obvious strategic, political, and litigation interests implicated, and we have had no hearing to sort through the issues. Simply accepting an important, but contested point, while ignoring inconvenient counter-arguments, grafts poor judging onto what may be not-so-accepted science—for all we know.

**9.** If the study cited by the Commonwealth is true, the discrepancy should implicate a weighing of prejudice against probative value under Pennsylvania Rule of Evidence 403 (evidence may be excluded if its probative value is outweighed by prejudicial effect, confusion, etc.), as argued by the Commonwealth. *See* Commonwealth's Brief at 9, 20.

Although the parties, and appellant's *amici*, have placed an abundance of literature before this Court, the studies on the discrete issue of the effectiveness of expert testimony in assisting the jury in this area should be the one of prime concern—and it is fairly disputed. The underlying empire of research touting the effectiveness of this sort of expert testimony is overstated. Of twenty-four studies published on the effect of expert testimony, only three evidenced an increase of jury sensitivity to factors affecting reliability, and those results were modest. *See* Commonwealth's Brief at 15–17 (citing Martire & Kemp, *supra*).[10] The question of the legitimacy of the literature, what reliable "scientific" conclusions can be drawn from it, and if and how the Court should respond, require a hearing where the proffers themselves can be examined and tested—including by the great engine of cross-examination. The "literature" cited by the Majority deserves no more deference than an identification witness, or the victim of a crime, receives.

Putting aside the Majority's one-sided approach to the research, the Majority also fails to address a host of practical problems posed by the Commonwealth, such as: (1) the

**10.** In a footnote, the Majority criticizes the Commonwealth's reliance on the Martire & Kemp article and notes that only one study out of twenty-four "established that expert testimony can significantly improve a juror's ability to discriminate between accurate and inaccurate eyewitness identifications," while the authors found the others to be either methodologically deficient for evaluating this theory, or inconclusive. Majority Op. at 482 n. 9, 92 A.3d at 785 n. 9. What should matter more, however, is what the article says about what is in fact a paucity of "scientific" evidence supporting the broad holding rendered by the Majority today, one that the Majority claims is based on compelling scientific studies. The body of research relied on by the Majority in making its pronouncement today in fact is exaggerated in the extreme. Indeed, the authors of this article agree that "the most appropriate conclusion regarding the extent to which expert evidence aides the jury in reaching an accurate resolution of a disputed issue, is that the case is not yet proven." Martire & Kemp at 34. It is not prudent to base our innovative "scientific" decision today on one study that indicates expert testimony may be beneficial in this area, nor do I subscribe to the Majority's contention that "the **possible** educational value of expert testimony" renders the absolute bar on "expert" evidence, intruding into a core jury function, unsupportable. *See* Majority Op. at 493, 92 A.3d at 792 (emphasis added).

exposure of hundreds, if not thousands, of violent felony convictions to potential ineffective assistance of counsel attacks where no such expert testimony is presented; (2) the cost of the now-required expert testimony by both the prosecution and the defense; and (3) the encouragement of gamesmanship by potentially rewarding defendants who refrain from calling an expert, only to attack the omission on collateral review or in federal *habeas* proceedings. *See* Commonwealth's Brief at 21–23. The Majority side-steps these concerns by "envisioning" limited use of the testimony, quipping that there is a cost for all tools used to achieve justice, and relying on the supposed collective experience of the other jurisdictions that have allowed the testimony. *See* Majority Op. at 485–87, 92 A.3d at 787–88.

The Majority's vision of a limited role for this testimony is at best naïve given that this new rule will be a tool for defense counsel, who are obliged to advocate zealously for their clients. As explained above, the expert testimony the Majority approves exists only to **undermine** identifications, by highlighting what some experts believe **can**—generally, of course, not necessarily in a particular case—make an identification **unreliable.** There is no downside to the defense in such testimony, only upside. In every case with a contested identification, counsel will of necessity demand an expert—or counsel will be faulted on a later collateral attack. The Majority also fails to show whether the new testimony will actually lead to more just results (*i.e.*, whether it will rectify the costs associated with wrongful convictions, *see id.* at 494 n. 11, 92 A.3d at 792–93 n. 11), let alone whether the results will justify the price-tag.[11]

11. The Majority states that, "there is no doubt that wrongful conviction due to erroneous eyewitness identification continues to be a pressing concern for the legal system and society." Majority Op. at 473, 92 A.3d at 780. Although misidentification resulting in conviction is a grave injustice, the point is to take measures that enhance reliability and enhance the ability to assess reliability. The Majority relies upon a study stating that in nearly 80% of the first 200 cases where convictions were overturned due to DNA testing, the convictions were based upon eyewitness testimony. *Id.* at 471–72 & n. 7, 92 A.3d at 779 & n. 7 (citing Brandon L. Garrett, *Judging Innocence,* 108 Colum. L.Rev. 55, 60 (2008)). But that same study also noted that "exonerees typically had more than one type of evidence supporting their convictions," including

 

## II. Alternative Approaches

Even assuming that there is a solid, prevailing "science" in this social science arena, it is not self-evident why a jury charge and cross-examination cannot suffice to educate the fact-finder to the concerns attending identification evidence. Again assuming the science is generally accepted and reliable, why is there a need for an expert? A modified *Kloiber* charge could present to the jury factors regarding eyewitness identifications for the jury to consider in its deliberation. The Majority summarily dismisses the notion with the off-point comment that the concerns here are not ones **currently** addressed by a *Kloiber* charge, as if the charge somehow was not subject to modification. Majority Op. at 484 n. 10, 92 A.3d at 786–87 n. 10. The Majority also cites *Clopten* and *State v. Copeland,* 226 S.W.3d 287 (Tenn.2007) as definitive authorities for the proposition that "research" indicates that cautionary instructions are inadequate.

I respectfully disagree. First, the concerns the Majority speaks of that affect identifications—weapons focus, cross-racial identification, stress, etc.—fit comfortably into the notion of "the compromised position of the witness," an element of the existing *Kloiber* charge. If the purpose of the expert testimony is to apprise the jury of factors that **could have had** some effect on the witness's ability to accurately recall details of an event, the factors here need not be treated any differently than those currently described in a *Kloiber* charge.

The Majority's other justification for dismissing appropriate jury charges, and requiring the expense of experts, is that a jury charge in this particular instance must be deemed inadequate as a matter of law. However, the supporting authority cited by the Majority on this point is anything but scientific. Both *Clopten* and *Copeland* cite a handful of studies, as well as

forensic evidence (57% of cases), testimony by confidential informants (18%), and false confessions by the defendants themselves (16%). Garret, *supra* at 60 n. 18. Without analysis of the actual influence that eyewitness testimony had on the convictions, relative to other evidence, and without any science on how the expert testimony the Majority now approves enhances the jury's ability to **distinguish** identifications, the Majority's new rule here does not address the problem it identifies.

the Utah Supreme Court's decision in *State v. Long*, 721 P.2d 483 (Utah 1986). These sources, insofar as they mention jury instructions at all,[12] criticize the implementation of and experience with so-called *Telfaire*[13] instructions, the federal analog to our *Kloiber* charge, endorsed by the United States Court of Appeals for the District of Columbia in 1972.

Insofar as the Majority's preferred sources focus on the cautionary instructions in use today, they beg the question whether future, more robust instructions, would be effective, more reliable (settled "science" should not implicate credibility), and less expensive. In fact, the psychologists behind this handful of studies seem to argue that the kind of instructions then in use—nineteen years ago—were "a step in the appropriate direction"[14] and acknowledge that instructions are helpful because they can be "based on a careful analysis and balancing of policy concerns, including potential risks of eyewitness identification both in terms of accuracy and unjustified jury reliance," even if they also portray shortcomings.[15] It is this quality alone that justifies the use of instructions over expert testimony, testimony purchased by advocates, which will inevitably betray the advocate's slant.

To be sure, some sources in this area, itself laden with litigation incentives, have hedged against these acknowledgments—not with facts based on research, but with mere opinion based on speculation. For example, *Clopten* cited a now eighteen-year-old law review article which posited, notably without citation:

> There is no scientific evidence that cautionary jury instructions, given at the end of what might be a long and

12. *See* Elizabeth Loftus, *Reconstructing Memory: The Incredible Eyewitness*, 15 JURIMETRICS J. 188, 189–90 (1975) (cited by *Clopten*, study did not mention jury instructions and merely found that in simulated criminal trial, students were more likely to convict in light of eyewitness testimony, even if eyewitness was discredited by his poor eyesight).

13. *United States v. Telfaire*, 469 F.2d 552 (D.C.Cir.1972).

14. Cutler & Penrod, *supra* note 8, at 256.

15. Peter J. Cohen, *How Shall They Be Known? Daubert v. Merrell Dow Pharmaceuticals and Eyewitness Identification*, 16 PACE L.REV. 237, 272 (1996).

> fatiguing trial, and buried in an overall charge by the court, are effective. A powerful eyewitness' [sic] testimony may be so firmly embedded in the jurors' minds that the court's instructions days or weeks later may be unable to undo potential prejudice. In short, once a juror has decided that the eyewitness identification is dispositive, there is no guarantee that trial court instructions at a later time will change his or her mind.

Cohen, *supra* note 15, at 272–73. The author, a medical doctor who had graduated from law school a year before the article appeared, does not ground his assertion in research, much less upon "science," but instead upon a negative implication of the lack of research, and also by speaking of undefined "guarantees" on the point. To those of us with a little more experience in how law is practiced and how jury trials proceed—including the flexibility of when instructions are given, and their actual effect upon juries—this newly-minted lawyer's unsupported opinions are difficult to take seriously. The vast majority of standard jury charges are not supported by "scientific evidence," nor should they be.

Additionally, the few remaining psychological studies cited in *Clopten* [16] may show that while *Telfaire* instructions may not significantly influence the manner in which jurors evaluate eyewitness identification evidence (*i.e.*, the instructions produce neither confusion nor clarity for the jury), an alternative version of such instructions (for example, sample instructions drafted by psychologist Edith Greene, Ph.D., for her study) may even produce unwarranted prejudice against the prosecution.[17] While I can accept that a more even-handed refinement of our cautionary instructions could strike an appropriate balance (whether it requires a "complete remaking" or a "mere reworking" of the instructions, *see* Majority Op. at 484 n. 10, 92 A.3d at 787 n. 10), if the "science" were proven after the hearing the Majority's broad holding has avoided, the

---

16. *See* Edith Greene, *Eyewitness Testimony and the Use of Cautionary Instructions*, U. BRIDGEPORT L.REV. 15, 20 (1987); Cutler & Penrod, *supra* note 8, at 255–64 (a meta-analysis of authors' own study and derivative analysis of Dr. Greene's studies).

17. Cutler & Penrod, *supra* note 8, at 263.

point here is that the third-hand authorities cited by the Majority do not support its definitive conclusion that cautionary instructions, which are routinely employed by courts to guide the jury's consideration, which can be neutrally drafted, and which ensure a fair and even application across cases, cannot be effective in this one "special" area.

The Majority also discredits the defense bar's ability to "educate the jury with respect to the fallibility of eyewitness identification" through cross-examination and closing arguments. The Majority declares that this inability "is especially true when cross-examining a neutral, credible, and confident witness before a jury, which may overestimate the veracity and reliability of eyewitness identification" and baldly asserts that "such information would not be within the permissible scope of cross-examination." Majority Op. at 483, 92 A.3d at 786 (citing Jules Epstein, *The Great Engine That Couldn't: Science, Mistaken Identity, and the Limits of Cross–Examination*, 36 STETSON L.REV. 727 (2007)). This is the sum of the Majority's analysis on the topic, followed by a few general citations to other jurisdictions, again without addressing any of the Commonwealth's arguments.

I fail to see how cross-examining a sincere, confident witness can "overestimate" the reliability of the identification, yet expert testimony would not "overestimate" its unreliability. In fact, the Majority's only source of information here comes from a law professor, well known to the Court as an experienced and able advocate for the criminal defense, and who, with his typical candor, employs a title that makes clear which side he favors. Moreover, the cited article does nothing more than pose hypothetical concerns regarding the pitfalls of cross-examination and provide a cursory examination of a handful of psychology papers from almost twenty years ago. *See* Epstein, *supra*, at 770–84.[18]

18. I am reminded of the observation of the Chief Justice of the United States, a renowned appellate advocate before his ascent to the bench: "Pick up a copy of any law review that you see and the first article is likely to be, you know, the influence of Immanuel Kant on evidentiary approaches in 18th-century Bulgaria, or something, which I'm sure was of great interest to the academic that wrote it, but isn't of much help to

Moreover, in my view, the only information arguably outside the easy scope of cross-examination is the notion that witness confidence may not correlate to witness reliability—every other factor affecting witness reliability is clearly fair game for cross-examination. *See, e.g., Manson v. Brathwaite*, 432 U.S. 98, 113 n. 14, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) ("While identification testimony is significant evidence, such testimony is still only evidence. . . . Counsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification including reference to both any suggestibility in the identification procedure and any countervailing testimony such as alibi.") (citations and quotation marks omitted). And, even as to the relationship between witness confidence and reliability, the popular phrases "always certain, often wrong" or "often wrong, never in doubt," reveal just how much that "phenomenon" is accessible to jurors.

Finally, if "education" is what this endeavor is all about, there is something to be learned from the actual trial in this case. As the Commonwealth points out, appellant's skilled trial attorney, employing the great engine that Professor Epstein thinks "can't," focused on several factors (cross-racial identification, stress, and weapons focus) in this case, both during cross-examination and in closing arguments, and the jury ultimately acquitted appellant of the robberies of three of the victims here. *See* Commonwealth's Sur–Reply Brief at 9–12 (citing N.T., 11/1/07, at 70, 73–75, 79, 92–93, 97). The Majority accepts as Gospel untested studies, but the actual record in this case shows the wisdom of the prevailing system.

the bar." Chief Justice of the United States John G. Roberts, Jr., Interview at Fourth Circuit Court of Appeals Annual Conference, June 25, 2011, available at *http://www.cspanvideo.org/program/FourthCi*. Even with less arcane subjects, the potential difficulty with law review articles rests itself in human nature: many professors devote their time and energy to projects they care deeply about and, lawyers being lawyers, few are truly "neutral" when writing to "hot topics" of the day. Primers to assist one side of a debate or another on a legal issue are not necessarily the most reliable of sources for tribunals.

### III. Lack of Guidance

Finally, the standard fixed by the Majority will offer little guidance to trial judges. The Majority paints its holding as a modest one that allows expert testimony on relevant factors concerning eyewitness identification, at the discretion of the trial court, following a *Frye* hearing, subject to review for an abuse of discretion. Majority Op. at 486–87, 92 A.3d at 788. The Majority also postulates that many of the questions I raise here will be "addressed through case-by-case development—the traditional process for changes in the law." *See* Majority Op. at 494 n. 11, 92 A.3d at 793 n. 11. But, of course, the Commonwealth cannot appeal an acquittal, so the law will develop in only one direction. Moreover, what room is there for a *Frye* hearing? The Majority has already rendered its verdict on the "science"; trial judges are no more vested with discretion to ignore the Court's verdict on the science today than they were vested with discretion to ignore *Simmons* yesterday. All that actually remains is for trial courts to determine the relevance of the evidence in a particular case.

Where the eyewitness identifications giving rise to the Court's decision today are at issue, there is little non-arbitrary room for the exercise of discretion. This is yet another circumstance weighing in favor of considering neutral jury charges, if the Court insists on going down this path.

### IV. Conclusion

In the end, neither party disputes that the expert testimony proffered by appellant was properly excluded by the trial court under our existing decisional law in this area. If we are to move away from that precedent, the decision needs to be better-grounded, and should follow only after a remand to resolve the contested issues here, and a more balanced assessment.

I respectfully dissent.

Justice EAKIN, dissenting.

The majority overrules the long-standing prohibition of testimony that offers opinions about the reliability of specific

eyewitness identification. While there are evolving studies about identification testimony, I believe the more prudent course would be to recognize such concerns through enhanced jury instructions from the court, rather than authorizing a testimonial battle of opinions from experts. Because I believe hired opinion testimony about the reliability of other witnesses will muddy the jury's efforts to determine the truth, I dissent.

The majority's assertion is that such testimony would merely "assist" the jury in understanding factors that may affect an eyewitness's credibility. However, admitting such testimony *necessarily* involves an " 'unwarranted appearance of authority in the subject of credibility[.]' " *Commonwealth v. Spence,* 534 Pa. 233, 627 A.2d 1176, 1182 (1993) (quoting *Commonwealth v. Gallagher,* 519 Pa. 291, 547 A.2d 355, 358 (1988)). Indeed, if the witness is not recognized as having the appearance of authority, the witness is not qualified to opine in the first place. The jurors will learn the witness's opinion is given to them because the court believes the witness knows more about identification than they do. Such recognized-as-authoritative testimony will necessarily and impermissibly intrude upon their role as the sole arbiter of witness credibility— testimony about "characteristics" of the identification and "explaining" how this affects other evidence tautologically invades the jury's function. *See Commonwealth v. Champney,* 574 Pa. 435, 832 A.2d 403, 408 (2003) (citation omitted); *Spence,* at 1182 (citation omitted).

The majority suggests this will "assist the trier of fact in understanding the evidence[,]" Majority Op., at 488, 92 A.3d at 789, as if a jury has trouble understanding an eyewitness's identification. It will purportedly do so by "focus[ing] on particular characteristics of the identification at issue and explain[ing] how those characteristics call into question the reliability of the identification[,]" *id.,* at 493, 92 A.3d at 792, and my colleagues believe this can be done without expressing an opinion on the reliability of a specific eyewitness, *see id.,* at 479–80, 92 A.3d at 784. How does an expert do that—name the factors the expert believes "call into question the reliability of the identification" without expressing an opinion about

it? Apparently the witness will say, "Here are some things that 'call into question the reliability of the identification'—but I'm not really giving you my opinion the testimony is wrong." The expert, *by definition*, is a witness called to express an opinion, *see* Pa.R.E. 702, and the way to "call into question" another person's testimony is by giving an opinion.

The majority minimizes the practical effect of this ruling, rejecting the suggestion that thousands of cases will be impacted. Given the number of criminal cases filed in Pennsylvania each year, "thousands" is in fact a realistic, and not insignificant, number. The majority also brushes aside the expense as the cost of doing business, which is easier to say when we are not paying the bill. But such cost is not irrelevant to the client, or the defenders and prosecutors of our local court systems, which must pay the new experts, pay for their reports, pay for their appearance at the required *Frye* hearings, and pay them for their appearance at trial.

It may be true the impact of allowing such testimony has not resulted in appellate complaints around the country, but, realistically, the actual cost, in time and money, is never going to be an appealable issue litigated at the appellate level. Nor can an appellate court really appreciate the impact on a jury. It is at the trial level where this reality will exist and where the non-esoteric side of this will be evident. Indeed, the only time this Court is likely to confront the issue is on collateral review. While such issues are recognized by the majority, they are not discussed, yet in every case of identification it will of course be ineffectiveness for defense counsel to fail to call such a witness now—what reasonable strategy is advanced by failing to do so?

While acknowledging both sides may call such experts, the majority anticipates such experts will be largely one-sided, to "explain how those characteristics call into question the reliability of the identification." Majority Op., at 493, 92 A.3d at 792. Yet, if such testimony does not invade the province of the jury and will assist the jury in understanding matters beyond its ken (a predicate for allowing such testimony), then it will also be admissible as direct evidence, just like other

forensic opinions, such as ballistics, fingerprints, DNA, or the like. The prosecution will be able to bolster its case-in-chief with an expert opining why the identification witnesses are credible. And if experts may opine about identification, why would they not be equally admissible on other peripheral matters, such as witness recollections of time, dates, places, colors, types of cars, clothes, directions, and a host of matters which any given witness is likely to confuse? There being no logical difference, likening this decision to the camel's nose under the tent is not an exaggeration.

There is a better course, in my judgment, that will not need to push aside these legitimate concerns. That course is to revise and enhance the standard jury instructions on identification evidence. If current sociological studies [1] have identified factors that may affect identification, such can be append-

1. Though the majority refers to them as "science," these studies are not, of course, "hard science." They are really sociological and psychological studies. However, let us assume *arguendo* the studies "strongly suggest[ ] that eyewitnesses are apt to erroneously identify a person as the perpetrator of a crime when certain factors are present[.]" *Id.*, at 23. Equally scientific literature suggests it is unlikely that expert testimony "achieve[s] its objective—to reduce wrongful convictions without also increasing wrongful acquittals." Kristy Martire & Richard Kemp, *Can Experts Help Jurors to Evaluate Eyewitness Evidence? A Review of Eyewitness Expert Effects*, 16 Legal & Criminological Psychology 24, 33 (2011).

This comprehensive, peer-reviewed article found that only three of the 24 studies looking at the effect expert witnesses have on jurors used the appropriate methodology to determine whether such testimony achieves this objective. *Id.; see also id.*, at 27–32 (describing different methodologies and advantages and disadvantages of each). Of these three studies, "two were subject to the peer review process, and neither of these provided evidence that the testimony of an eyewitness expert significantly improved juror ability to discriminate accurate from inaccurate identifications." *Id.*, at 33 (internal citations omitted). While the majority believes the authors' recommendation for further studies "does not *ipso facto* mandate the continued ... ban on expert testimony in this area," Majority Op., at 482 n. 9, 92 A.3d at 786 n. 9, the need for additional studies equally does not ipso facto mandate overruling the long-standing precedent banning such testimony. Moreover, that studies have "conclude[d] the impact of expert evidence was not significantly different from that of focused jury instructions[,]" *id.*, at 482 n. 9, 92 A.3d at 786 n. 9 (citation omitted), is a dubious justification for permitting this testimony, especially in light of the associated costs in

ed to existing instructions from the court. There are already comprehensive proposals that would accomplish this; in fact, there are proposed jury instructions for Pennsylvania, drafted with the participation of the very Dr. Loftus mentioned favorably by the majority and cited by Justice Brennan. This is, in my judgment, a better path, educating the jury without starting a war of hired doyens attacking each other's opinion, and more significantly, attacking the veracity of witnesses and victims of crime. We have finally recognized the judicial system should not victimize these citizens again—let us not subject them to being publically discredited, their testimony given under oath torn down in view of all by specialists hired for the singular purpose of "calling into question" what the witnesses have said was true.

If the factors that affect identification are indeed appropriate, is it not better they be imparted to the jury by the impartial instruction of the court, rather than as an argumentative negative? Can we not avoid the attack on the witness by the less-than-impartial advocacy of those whose studies give them a point of view that lead to their hiring in the first place? After all, no defendant will hire someone whose opinion confirms an identification, nor will the prosecution present someone who disputes the eyewitness—and surely there will be experts willing to opine in favor of whatever side wishes to employ them.

Improved and enhanced jury instructions would accomplish the same result in a more seemly and significantly more impartial manner.[2] Properly enhanced instructions would address every concern of the majority, without invading the jury's role, without implicating extra costs for both sides, without additional *Frye* and related hearings that consume limited judicial time, and without inviting or mandating claims of ineffectiveness. Here is a better, less costly, less adversarial, and at least equally efficacious approach to addressing the

time and money incurred by trial courts across the Commonwealth discussed above.

2. To suggest "it is difficult to understand [how] such information, coming from a judge by way of instructions, would have less of an impact on the credibility function of the jury[,]" *id.*, at 484 n. 10, 92 A.3d at 787 n. 10 (citation omitted), ignores the obvious difference between the neutrality of a judge's instructions and the partiality of a witness's testimony.

concerns about identification testimony. As I would utilize and evaluate this approach before making cases turn on a battle of the experts, I must respectfully dissent.

Chief Justice CASTILLE joins this dissenting opinion.