J-A23001-14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| ABRAHAM MITCHELL, | : | |
| | : | |
| Appellant | : | No. 1309 WDA 2012 |

Appeal from the Judgment of Sentence March 19, 2012,
Court of Common Pleas, Allegheny County,
Criminal Division at No. CP-02-CR-0016261-2010

BEFORE:  DONOHUE, ALLEN and MUSMANNO, JJ.

MEMORANDUM BY DONOHUE, J.:                **FILED SEPTEMBER 09, 2014**

Abraham Mitchell ("Mitchell") appeals from the March 19, 2012 judgment of sentence entered by the Allegheny County Court of Common Pleas following his conviction of third-degree murder and carrying a firearm without a license.[1]  Specifically, Mitchell asserts that the trial court abused its discretion by permitting the Commonwealth to admit a photograph that depicted the victim's body after the shooting.  Upon review, we affirm.

The trial court summarized the facts of the case as follows:

> On November 13, 2010, [Mitchell] and Bradley Smith arranged to purchase fifteen bricks of heroin from Duerryl Whitaker for $3,750. The purchase was facilitated and arranged by Jasmine Howard and Clarence White, who were relatives and friends of Whitaker. (T.T. 191, 197, 244, 453, 459, 729-733). That evening Howard and White drove to the Carnegie section of Allegheny County and picked up

---

[1]  18 Pa.C.S.A. §§ 2502(c), 6106(a)(1).

[Mitchell] and Smith. They returned to Howard's apartment in the Crafton Heights section of the City of Pittsburgh where they awaited Whitaker's arrival. (T.T. 41-42, 49, 193-194, 456, 729-730, 732). At approximately 7:00 P.M., Whitaker arrived with a small cardboard box containing the heroin. (T.T. 196, 751, 774-775). Whitaker had a brief conversation with Howard in her bedroom and then went to the living room where he approached [Mitchell] and Smith to discuss the heroin purchase. T.T. 196-197, 244-245, 247, 458, 750).

The money and drugs were placed on the couch for the transaction, but Smith took back the money when he saw that Whitaker had only brought approximately thirty bundles of heroin. (733-735, 747, 751, 753, 780). When Smith took back the money, Whitaker stated, 'No, whoa, whoa, nah,' and a struggle ensued between Smith and Whitaker. (T.T. 754). Whitaker managed to get on top of Smith, and Smith pulled out a .22 revolver and shot it once, not striking Whitaker. Smith and Whitaker began to struggle over the gun, and [Mitchell] pulled out a .380 semiautomatic and fired a shot into the couch. Howard ran into her bedroom to retrieve her handgun while Smith and Whitaker continued to struggle. [Mitchell] ran over to Whitaker and shot him multiple times ('emptied the gun'), and fled the apartment. (T.T. 198, 250, 252-255, 735-739, 742-743, 755, 760, 780). Smith, now freed from the struggle as a result of Whitaker being shot by [Mitchell], also shot Whitaker, grabbed the heroin, and fled the apartment. (T.T. 199, 210, 255-256, 743, 760). Howard pursued Smith and shot him in the leg as he ran down the hallway outside the apartment. [Mitchell] and Smith escaped down a staircase to the outside of the building. (T.T. 199-201, 224, 257, 269, 761-763, 789, 793).

Howard returned to her apartment to find Whitaker unresponsive and lying on his face. After turning him over, she called 911 and yelled out the window for help. (T.T. 201-202). Whitaker was pronounced dead

on scene by responding paramedics. (T.T. 43). As a result of being shot a total of seven times, Whitaker suffered a perforated lung, spleen, stomach, pericardium, aorta, and femoral vein, as well as a fractured rib and left shoulder. The cause of death was multiple gunshot wounds to the trunk, and the manner of death was homicide. (T.T. 410, 412-416, 418-419, 450).

The gunshots inside Howard's apartment alerted Victory Security guard Ian Clinton, who saw [Mitchell] and Smith emerge from the building. Clinton drew his weapon and ordered both fleeing shooters to stop. (T.T. 383-385, 387). [Mitchell] and Smith disregarded Clinton and fled down the fence line adjacent to the building, with Clinton in pursuit and continuously ordering them to stop. (T.T. 385). [Mitchell] jumped down a steep hill to a parking lot below, and escaped through a pathway. (T.T. 340-341, 385). Smith jumped down the hill and fell, dropping the box of heroin. He limped to the pathway without the heroin. (T.T. 341-342, 349-350, 385, 389). Clinton pursued Smith until Clinton tripped at the entrance to the pathway. The pathway led to the Crucible Street side of the apartment complex and access to a Port Authority busway. (T.T. 341, 385-386). Unable to continue the pursuit, Clinton returned to the apartment building and gave a detailed description of what Smith was wearing and his direction of flight to City of Pittsburgh Police on scene. Officers Aaron Loughran and Vincent Pacheco began to search for [Mitchell] and Smith in their respective marked police vehicles. (T.T. 370, 387, 390, 514). After a brief chase, officers Pacheco and Loughran apprehended Smith, and Clinton identified Smith as one of the individuals he chased from the apartment building complex. (T.T. 374-375, 386-387, 515-516). Smith was transported to the hospital for a gunshot wound to the leg. (T.T. 379, 517). Howard identified [Mitchell] in a photo array as one of the two individuals who shot Whitaker and he was later arrested and charged as noted

> hereinabove. (T.T. 204-205). Smith was charged as a co-defendant.
>
> Police recovered one .22 caliber bullet, four .380 cartridge casings, and one .380 caliber bullet fragment from inside the apartment. The medical examiner's office removed one .22 caliber bullet and two .380 caliber bullets from Whitaker during the autopsy. The crime lab was able to determine that the .380 caliber bullets and fragment matched each other and were discharged from the same firearm, and that Howard's .380 pistol was excluded as a match. It was determined that three .380 cartridge casings, one .380 caliber bullet, and two .380 caliber bullet fragments recovered from the hallway matched Howard's .380 pistol. (T.T. 637, 639, 641-642, 644-646).

Trial Court Opinion, 1/10/14, at 4-7 (footnotes omitted).

A jury trial took place from December 13 through December 19, 2011. The jury convicted Mitchell of the above-listed offenses and acquitted him of robbery and criminal conspiracy.[2] The trial court sentenced him on March 19, 2012 to an aggregate term of 20 to 40 years of imprisonment.

Mitchell filed timely post-sentence motions on March 22, 2012, requesting reconsideration of his sentence and challenging the weight of the evidence to support his conviction of third-degree murder, asserting that the jury instead should have convicted him of voluntary manslaughter. Trial counsel also filed a motion seeking leave to withdraw. The trial court granted trial counsel permission to withdraw and appointed new counsel to represent Mitchell. Prior to the trial court disposing of Mitchell's post-

---

[2] 18 Pa.C.S.A. §§ 3701(a)(1), 903(a)(1).

- 4 -

sentence motions, new counsel prematurely filed a notice of appeal on April 18, 2012. On July 27, 2012, the post-sentence motions were denied by operation of law. On August 8, 2012, new counsel filed a praecipe to withdraw the original appeal filed and subsequently filed a timely notice of appeal on August 27, 2012.[3] The trial court issued an order for counsel to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Counsel requested, and the trial court granted, numerous continuances because of the unavailability of several volumes of the notes of testimony from trial.[4] Counsel ultimately complied with the trial court's request, and the trial court filed its written opinion pursuant to Pa.R.A.P. 1925(a).

Mitchell raises one issue for our review: "Whether the trial court abused its discretion in allowing Exhibit 8 (a photograph) into evidence?"

---

[3] Although Mitchell filed his notice of appeal 31 days after the denial of post-sentence motions, the thirtieth day fell on a Sunday, and thus the notice of appeal was timely filed the following Monday. *See* Pa.R.A.P. 903(a) (appeals from the lower courts must be filed within 30 days of the entry of the order appealed from); Pa.R.C.P. 106(b) ("Whenever the last day of any such period shall fall on Saturday or Sunday, or on any day made a legal holiday by the laws of this Commonwealth or of the United States, such day shall be omitted from the computation.").

[4] According to the trial court, on May 9, 2013, it issued a Rule to Show Cause why the court reporter should not be held in contempt based upon the court reporter's failure to produce all notes of testimony from trial. Trial Court Opinion, 1/10/14, at 3 n.5. The court held a contempt hearing, and in June, the court reporter produced the notes of testimony. *Id.*

Mitchell's Brief at 5. We review this issue according to the following well-settled standard:

> Traditionally, in reviewing trial court decision making regarding the admissibility of evidence, an appellate court determines whether the lower tribunal abused its discretion. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is over ridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

*Commonwealth v. Walker*, 92 A.3d 766, 772-73 (Pa. 2014) (internal citations and quotations omitted). This is also true for our review of the admission of photographic evidence, which we will likewise affirm absent an abuse of discretion. *Commonwealth v. Spell*, 28 A.3d 1274, 1279 (Pa. 2011).

> When considering the admissibility of photographs of a homicide victim, which by their very nature can be unpleasant, disturbing, and even brutal, the trial court must engage in a two-step analysis:
>
> First a [trial] court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

*Id.*

Mitchell contends that Commonwealth's Exhibit 8 – a color photograph of the victim, lying as police found him, with blood on the floor beneath and

next to his left arm – was inadmissible because its probative value was outweighed by the danger of unfair prejudice, and its admission warrants the grant of a new trial. Mitchell's Brief at 17-21. The trial court found that Mitchell waived consideration of the inflammatory nature of the photograph because of his failure to include it in the certified record. Trial Court Opinion, 1/10/14, at 11. Nonetheless, the trial court found that the photograph was relevant and admissible, as it aided the jury in understanding the crime scene and witness testimony. *Id.* at 11-12.

We begin by addressing the trial court's finding of waiver. We believe the trial court misconstrues waiver involving the certified record. It is true that "***appellate courts*** are limited to considering those facts that have been duly certified in the record on appeal." ***Commonwealth v. Williams***, 715 A.2d 1101, 1103 (Pa. 1998) (emphasis added). It is also true that an appellant's failure to ensure the record certified for appeal contains information needed for this Court to conduct a review results in waiver of the issue(s) raised. ***Commonwealth v. Martz***, 926 A.2d 514, 524-25 (Pa. Super. 2007). These statements of the law, however, are not applicable to trial courts, as the record is not "certified" prior to its transmission to this Court on appeal. Rather, pursuant to Rule 1931(c) of the Pennsylvania Rules of Appellate Procedure, the clerk of the lower court transmits the complete record to this Court for review, certifying at that time that it is the entire record. ***See*** Pa.R.A.P. 1931(c). In this case, the record reflects that

Kate Barkman, the Allegheny County Clerk of Courts certified for transmission to this Court the entire record on January 13, 2014. ***See*** Certificate and Transmittal of Record to Appellate Court, 1/13/14.

Furthermore, once the record is transmitted to this Court, parties still have an avenue to supplement the record that has been certified for appeal. Pursuant to Rule 1926, a party may seek to correct or modify the record:

> (a) If any difference arises as to whether the record truly discloses what occurred in the trial court, the difference shall be submitted to and settled by that court after notice to the parties and opportunity for objection, and the record made to conform to the truth.
>
> (b) If anything material to a party is omitted from the record by error, breakdown in processes of the court, or accident or is misstated therein, the omission or misstatement may be corrected by the following means:
>
> (1) by the trial court or the appellate court upon application or on its own initiative at any time; in the event of correction or modification by the trial court, that court shall direct that a supplemental record be certified and transmitted if necessary; or
>
> (2) by the parties by stipulation filed in the trial court, in which case, if the trial court clerk has already certified the record, the parties shall file in the appellate court a copy of any stipulation filed pursuant to this rule, and the trial court clerk shall certify and transmit as a supplemental record the materials described in the stipulation.
>
> (c) The trial court clerk shall transmit any supplemental record required by this rule within 14 days of the order or stipulation that requires it.

> (d) All other questions as to the form and content of the record shall be presented to the appellate court.

Pa.R.A.P. 1926.

In the case at bar, the record reflects that on February 7, 2014, pursuant to Rule 1926, the parties stipulated that Exhibit 8 "was admitted into evidence" at trial but "was not transmitted to the Superior Court" in the certified record, and that the exhibit "should be transmitted to the Superior Court." Stipulation, 2/7/14, at ¶¶ 1, 3, 4. The trial court signed the order attached to the stipulation, requiring the clerk of courts "to promptly forward [Exhibit 8] to the Prothonotary of the Superior Court of Pennsylvania to be made part of the official record[.]" Trial Court Order, 2/7/14. We therefore have Exhibit 8 before us and there is no basis for us to find waiver of the issue relative to the certified record.

We note that Pennsylvania Rule of Criminal Procedure 113(B) requires that the clerk of courts maintain a list of docket entries, defined as "a chronological list, in electronic or written form, of documents and entries in the criminal case file and of all proceedings in the case." Pa.R.Crim.P. 113(B). The docket entries in a criminal case must include, *inter alia*, "the location of exhibits made part of the record during the proceedings[.]" Pa.R.Crim.P. 113(C)(7). Thus, the trial court should always be able to ascertain the location of the exhibits entered and obtain them if necessary. Our review of the record reveals that, in contravention to Rule 113, there

are no notations in the docket to indicate the location of the exhibits.[5]  Thus, if the trial court was hampered by the inability to locate Exhibit 8, the issue was an administrative one more appropriately directed to the clerk of courts or her designee and not the basis for finding waiver by the Appellant.

Turning now to the substantive issue before us, we agree with the trial court that it did not abuse its discretion by admitting Exhibit 8 into evidence. The cases cited by Mitchell in support of his argument all pertain to photographs of autopsies or of the wounds sustained by the victim.  **See** Mitchell's Brief at 19-20 (citing **Commonwealth v. Eckhart**, 242 A.2d 271, 274 (Pa. 1968) (granting a new trial based on the trial court's admission of a photograph of the murder victim's skull, which included her "gruesome scalp and bloody web of tangled hair," which were irrelevant and could easily have been excised from the picture); **Commonwealth v. Powell**, 241 A.2d 119, 121 (Pa. 1968) (granting a new trial based on the trial court's admission of color photographs of the victim's autopsy, as "[w]hatever aid these photographs may have been, their use was clearly outweighed by the emotional impact it would undoubtedly have on the jury"); **Commonwealth**

---

[5]  In his appellate brief, counsel for Mitchell indicates that it is local practice in Allegheny County for admitted trial exhibits to be returned to counsel for the party that presented them for admission.  Mitchell's Brief at 16 n.4.  If that is in fact what occurred in this case, the trial court could have contacted the Commonwealth to obtain Exhibit 8 for its review prior to authoring its 1925(a) opinion.  There is no indication that the trial court made any overture to the Commonwealth in order to obtain Exhibit 8 prior to authoring its 1925(a) opinion.

*v. LeGares*, 709 A.2d 922, 924-25 (Pa. Super. 1998) (granting a new trial based on the trial court's admission of a "gruesome" and "gory" color picture of the victim's skull from the homicide by shotgun, including the depiction of "flesh flayed from the skull and folded back, the fractured skull wired together to reveal the gaping entry wound, and the victim's brain removed")). In the case at bar, on the other hand, the only objectionable feature of the photograph in question is the presence of blood. It is not an autopsy photo, no gunshot wounds are visible in the photograph, and there is nothing particularly gruesome or gory. *See* Commonwealth's Exhibit 8.

In *Commonwealth v. Spell*, our Supreme Court stated that a finding that a color photograph is inflammatory "is not [required] by the mere depiction of blood. Although the presence of blood on the victim depicted in the photographs is unpleasant, it is not in and of itself inflammatory. Murder evidence is not often agreeable, but sanguinity does not equal inadmissibility." *Spell*, 28 A.2d at 1279. The Court in *Spell* found no abuse of discretion in the admission of photographs of the victim's bloody face because they "aided the jury in understanding witness testimony regarding the body's condition and location." *Id.* at 1280.

In *Commonwealth v. Woodward*, 394 A.2d 508 (Pa. 1978), the trial court permitted the Commonwealth to enter into evidence black and white photographs of the bloodied body of the victim at the scene of the murder. *Id.* at 511. Our Supreme Court found no abuse of discretion in the trial

court's finding that the photographs were relevant "not only to corroborate the testimony of the medical pathologist, but also for the additional purpose of aiding and providing the jury with an overall view of the scene of the crime and the position of the body in relation to it." *Id.*

Here, as in *Woodward*, the contested photograph was of the victim at the scene of the murder, lying in a pool of blood, which the trial court admitted "for the purpose of allowing [the jury] to view the scene as it [was] being described by [Detective Boose]." N.T., 12/13/11, at 64. The trial court further issued a cautionary instruction to the jury, informing it of the purpose of the admission of the photograph and warning that the jury "should not let it stir up any motion to the prejudice of either defendant," again stating that the photograph was being admitted for a "limited purpose." *Id.* The trial court reiterated this cautionary instruction during its closing charge to the jury. N.T., 12/19/11, at 875-76.

The trial court found the photograph in question was not inflammatory and was relevant and assisted the jury's understanding of the crime scene and testimony concerning the crime scene. Trial Court Opinion, 1/10/14, at 11-12. Based upon our Supreme Court's holdings in *Spell* and *Woodward*, we find no abuse of discretion in this decision. *See Spell*, 28 A.3d at 1279; *Woodward*, 394 A.2d at 511.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/9/2014